## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

A.C., a minor, by her parent and guardian ad litem,                              :
Torrence S. Waithe, A.C., a minor, by her parent and                            :
guardian ad litem, Nicolas Cahuec,    A.F. and R.F., minors,                     :
by their parent and guardian ad litem, Aletha Forcier,                           :      Civil Case Number
I.M. and L.M., minors, by their parents and guardians ad litem                   :      1:18-cv-645
Jessica Thigpen and Anthony Thigpen, K.R.,  a minor, by her                      :
parent and guardian ad litem, Marisol Rivera Pitre, J.R.,                        :
a minor, by her parents and guardians ad litem, Moira Hinderer                   :
and Hillary Reser,  M.S., a minor, by his parent and guardian ad                 :
litem Mark Santow, M.S., a minor, by his parent and guardian ad                  :
litem, Amie Tay, M.S., a minor, by her parents and guardians ad                  :
litem, Maruth Sok and Lap Meas, A.W. and J.W., minors, by their                  :
parent and guardian ad litem, Chanda Womack, and N.X.,                           :
a minor, by her parents and guardians ad litem, Youa                             :
Yang and Kao Xiong, on behalf of themselves and all others                       :
similarly situated,                                                              :

Plaintiffs,                                            :
                                                                                 :
                                                                                 :      CLASS ACTION
                                                                                 :      COMPLAINT
v.                                                     :
                                                                                 :
Gina Raimondo in her official capacity as Governor                               :
of the State of Rhode Island, Nicholas A. Mattiello,                             :
in his official capacity as Speaker of the Rhode Island                          :
House of Representatives, Dominick J. Ruggerio,                                   :
in his official capacity as President of the Rhode Island                        :
Senate, Ken Wagner in his official capacity as                                   :
Commissioner of Education of the State of Rhode Island,                          :
the Rhode Island State Board of Education, and the                               :
Council on Elementary and Secondary Education,                                   :
                                                                                 :
Defendants.                                           :

## PRELIMINARY STATEMENT

1. Plaintiffs in this case allege that the state defendants have failed to carry out their responsibilities under the United States Constitution to provide all students a meaningful opportunity to obtain an education adequate to prepare them to be capable citizens. In *San Antonio Ind't Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973), the U.S. Supreme Court raised, but failed to provide an answer to, the question of whether students have a fundamental right under the fourteenth amendment to the opportunity of an education that provides them "the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id*. at 37. Plaintiffs are now asking this Court to consider this critical question and to answer it in the affirmative.

2. The primary reason our public school system was created was to ensure that "under our republican government, … education … [must be] sufficient to qualify each citizen for the civil and social duties he will be called to discharge…" Horace Mann, *Tenth Annual Report to the Massachusetts State Board of Education* (1846). In the 21st century, numerous state courts have recognized the continuing — and even more urgent — need in our complex internet age for all citizens to receive a sound basic education that will prepare them "to function productively as civic participants." *Campaign for Fiscal Equity v. State*, 801 N.E. 2d 326, 330 (NY 2003). "Mere competence in the basics — reading, writing and arithmetic — is insufficient … [a] broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute and

flourish in the twenty-first-century." *Claremont Sch. Dist. v. Governor*, 703 A.2d

1353, 1359 (N.H. 1997).

3.  Although the U.S. Supreme Court did not reach the precise question raised in the

present case, in *Brown v. Board of Education*, a unanimous Court did hold that

"education is perhaps the most important function of state and local governments....

It is the very foundation of good citizenship." *Brown v. Board of Education,* 347

U.S. 483, 493 (1954). The Supreme Court has also recognized that:

> "[E]ducation is necessary to prepare citizens to participate effectively and
> intelligently in our open political system if we are to preserve freedom and
> independence," *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972);

> "[The schools] are educating the young for citizenship," *Tinker v. Des
> Moines Indep. Sch. Dist*., 393 U.S. 403, 507 (1969); and

> "Schools are where the 'fundamental values necessary for the maintenance
> of a democratic political system' are conveyed," *Plyler v. Doe*, 457 U.S.
> 202, 221 (1983).

4.  Despite this virtually universal recognition of the schools' responsibility to prepare

young people to be capable citizens — and despite the specific language in the

constitution of the State of Rhode Island that recognizes that "the diffusion of

knowledge as well as virtue among the people" is "essential to the preservation of

their rights and liberties," and that it is the state's responsibility to "promote public

schools and … secure to the people the advantages and opportunities of education,"

R.I. Const. Art. 12, § 1, the state defendants have failed to provide the named

plaintiffs and tens of thousands of other students in the state of Rhode Island an

education that is adequate to prepare them to function productively as civic

participants capable of voting, serving on a jury, understanding economic, social and

3

political systems sufficiently to make informed choices, and to participate effectively in civic activities.

5. After decades of neglect of the civic purposes of education, it is a stark fact that on the most recent examination of knowledge of civics administered in 2014 to a national sample of eighth graders by the National Assessment of Educational Progress (NAEP) only 23% of these students reached the "proficiency" level.

6. The depth of ignorance that these scores reflect was further highlighted in a recent report on the schools' civic mission that recounted the following national statistics:

- Less than a third of eighth graders could identify the historical purpose of the Declaration of Independence, and less than a fifth of high school seniors could explain how citizen participation benefits democracy.

- In 2006, in the midst of both midterm elections and the Iraq [W]ar, fewer than half of Americans could name the three branches of government, and only four in ten young people (aged 18 to 24) could find Iraq on the map.

- Only one in five Americans between the ages of 18 and 34 read a newspaper, and only one in ten regularly click on news web pages.

Campaign for the Civic Mission of the Schools et al., *Guardian of Democracy: The Civic Mission of Schools* 14 (2011).

7. Preparing students to be capable citizens is of heightened importance today as many of our democratic institutions are being challenged and compromised, in large part because of wide-spread ignorance of their importance and of the public support that is necessary to maintain them. In this climate, schools serve a vital function; they remain one of the few places in our highly polarized society where people from diverse political, economic and cultural backgrounds can come together in a setting

4

where rational discussion and understanding of differing views can be prized and rewarded.

8.  Virtually all educators, scholars, and policy makers who have studied these issues have agreed that effective education for civic participation in the 21st century requires students to develop:

- Substantive knowledge of our governmental structures and the functioning of democratic institutions.

- Verbal, and media literacy skills.

- Interpersonal and civic engagement skills that stem from involvement in extracurricular activities, and school-based and community-based experiential opportunities; and

- basic character values like responsibility, honesty, and self-discipline, as well as important democratic values like tolerance, respect for due process, and the rule of law, and support for the fundamental political institutions of our society.

9.  The Guardians of Democracy Report, issued by the Campaign for the Civic Mission of the Schools chaired by former U.S. Supreme Court Justice Sandra Day O'Connor and former Congressman Lee Hamilton, validated these principles and set forth a series of "proven practices" for developing this civic knowledge, and these civic skills, experiences and values in all students. This report has been endorsed by a broad array of academic, civic, legal, and educational institutions, representing the full range of the political spectrum.

10. Nevertheless, the state defendants have failed to adopt and implement these principles and proven practices and have failed to provide the named plaintiffs and tens of thousands of other students in Rhode Island with adequate opportunities to

develop the civic knowledge, skills, experiences and values they need to function productively as civic participants.

11. Plaintiffs allege that the failure to provide them and the numerous other students who are similarly situated an adequate education for capable civic participation violates their constitutional rights under the Equal Protection, Privileges and Immunities and Due Process Clauses of the Fourteenth Amendment, the Sixth and Seventh Amendments and violates the guarantee that they will live in a state with a republican form of government under Article Four, Section Four of the United States Constitution.

## JURISDICTION

12. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343. Plaintiffs' action for declaratory and injunctive relief is alleged pursuant to 28 U.S.C. §§ 2201, 2202, and is authorized by 42 U.S.C. § 1983 which provides redress for the deprivation under color of state law of rights, and privileges and immunities secured to all citizens and persons within the jurisdiction of the United States. This action is predicated upon violations of the Fourteenth Amendment, the Sixth and Seventh Amendments, the Jury Selection and Service Act, 28 U.S.C.§ 1861, and Article Four, Section Four of the United States Constitution.

## PARTIES

*Plaintiffs*

13. Plaintiff A.C. is a student in the 12th grade at the Providence Career and Technical Academy in the Providence Public Schools.  She has been enrolled in the Providence

6

Public Schools since elementary school. She is a resident of the State of Rhode
Island.

14. Plaintiff A.C. is a student at the 360 High School in Providence, Rhode Island. She
is an English Language Learner and has received English Language Learner services
from the Providence Public Schools.  She is a resident of the State of Rhode Island.

15. Plaintiffs A.F. and R.F. are students in the 10th grade and in the 8th grade,
respectively, in the Woonsocket High School Career and Technical Center and in the
Woonsocket Middle School, in the Woonsocket school district. They are residents of
the State of Rhode Island.

16. Plaintiff J.R. is a student in the second grade at the International Charter School, a
public school in Pawtucket, Rhode Island.  She lives in Providence, Rhode Island
and is a resident of the State of Rhode Island.

17. Plaintiff K.R. is a student in the seventh grade at the Segue Charter School, a public
school in Central Falls, Rhode Island.  She lives in Central Falls, Rhode Island and is
a resident of the State of Rhode Island. She is an English Language Learner and
receives English Language Learner services from the Central Falls Public Schools.

18. Plaintiff M.S. is a student in the seventh grade at Nathan Bishop Middle School in
the Providence Public Schools.  He is a resident of the State of Rhode Island.

19. Plaintiff M.S. is a student in the 12th grade at Classical High School in the
Providence Public Schools.  He has attended Providence Public Schools since first
grade.  He is a resident of the State of Rhode Island.

20. Plaintiff M.S. is a student in the 11th grade at Classical High School in the Providence Public Schools. She has attended Providence Public Schools since first grade. She is a resident of the State of Rhode Island.

21. Plaintiffs I.M. is a student in the 11th grade at Cranston High School West in the Cranston school district. He is eligible for special education services. He is a resident of the State of Rhode Island.

22. Plaintiff L.M. is a student in the ninth grade at the MET School, a state operated career and technical school in Providence. She lives in Cranston, Rhode Island and until this year she attended public schools in the Cranston school district. She is a resident of the State of Rhode Island.

23. Plaintiff A.W. lives in Providence, Rhode Island and has attended public schools in Providence until this year. She is a resident of the State of Rhode Island.

24. Plaintiff J.W. is a pre-school-aged student. He lives in Providence, Rhode Island and will be enrolled in public school when he is old enough. He is a resident of the State of Rhode Island.

25. Plaintiff N.X. is a student in the 12th grade at Classical High School in the Providence Public Schools. She is a resident of the State of Rhode Island.

*Defendants*

26. Defendant Gina Raimondo, sued in her official capacity, is the Governor of the State of Rhode Island. As Governor, Defendant Raimondo is the chief executive officer of the state, has the responsibility to "take care that the laws be faithfully executed," pursuant to Art IX, § 2 of the Rhode Island Constitution and, as such, is responsible for ensuring that all provisions of the United States Constitution and all federal and

state laws and regulations relating to the state's responsibility for preparing students for civic participation are efficiently and effectively implemented.

27. Defendant Nicholas A. Mattiello, sued in his official capacity, is the Speaker of the Rhode Island House of Representatives, and defendant Dominick J. Ruggerio, sued in his official capacity, is the President of the Rhode Island Senate. The legislative bodies that they lead are responsible for exercising the legislative power of the State of Rhode Island and for "adopt[ing] all means necessary and proper to secure to the people the advantages and opportunities of education. . ."  R.I. Const. Art. XII § 1.

28. The members of Defendant Rhode Island State Board of Education are responsible for carrying out the responsibilities set forth in R.I. General Laws §§ 16-97-1 and 16-97-1.2 for all schools, Kindergarten through higher education, in the state, including long-range planning and establishing, coordinating and evaluating policies and programs for the public educational systems of the state. Eight of the seventeen members of the board, as designated by the Governor, also constitute the state's Council on Elementary and Secondary Education, R.I General Laws § 16-60-2.

29. Defendant Council on Elementary and Secondary Education has the power and duty to adopt standards and require enforcement and to exercise general supervision over all elementary and secondary public and nonpublic education in the state. The Council also appoints the commissioner of education, and exercises the other powers and duties set forth in R.I General Laws § 16-60-4.

30. Defendant Ken Wagner, sued in his official capacity, is the Commissioner of Education for the State of Rhode Island. The commissioner is the chief executive officer of the Department of Education and is vested with the powers and duties set

forth in R.I. General Laws § 16-60-6, including the responsibility for ensuring the administration and enforcement of the laws and regulations related to public education.  He is also the primary liaison to the United States Department of Education and other federal agencies.

**FACTUAL BACKGROUND**

31. American democracy today is facing severe challenges: the electorate is highly polarized, few people engage in conversation with individuals holding opposing views, and there is widespread acceptance and circulation of one-sided and erroneous information. Moreover, the proportion of eligible voters who actually vote is substantially lower than in most other developed countries, and the number of citizens who actively participate in local community activities has dramatically declined over the past half century.

32. These trends indicate that the schools in recent decades have failed to carry out their core responsibility to prepare young people to be good citizens, civically engaged, capable of safeguarding America's democratic values and our democratic institutions.  As former U.S. Supreme Court Justice Sandra Day O'Connor has stated, "We are failing to impart to today's students the information and skills they need to be responsible citizens." Foreword to *Campaign for Civic Mission of the Schools, No Excuse: Eleven Schools and Districts That Make Preparing for Citizenship a Priority and How Others Can Do It Too*, 5 (2010).

33. The nation's founders believed that the profound experiment in republican government that they were initiating depended on citizens' ability to participate in public life and to exhibit civic virtues such as mutual respect and prudent judgment. For the new republic to be maintained, the founding fathers believed that the role of the schools would be critical and that, as John Adams put it: "The education of a nation instead of being confined to a few schools and universities for the instruction of the few, must become the national care and expense for the formation of the many." David McCullough, John Adams, Simon & Schuster (2001).

34. In the nineteenth century, a "common school" system -- *i.e.* the American public school system -- was established precisely to ensure that all students, rich or poor, native or immigrant, could be educated together in a common environment in which civic knowledge and civic values could be inculcated.

35. Over the past half century, however, most American public schools, including most schools in Rhode Island, have substantially neglected their responsibility to prepare students for civic participation. Policy makers and educators, including the defendants in this case, have downgraded the teaching of social studies and civics, focusing in recent decades on basic reading and math instruction and on the economic value of education to individual students. They have also substantially neglected professional development of teachers in civics education.

36. Many young people today are apathetic regarding basic democratic values. A recent study found that when asked to rate on a scale of 1 to 10 how "essential" it is for them "to live in a democracy," 72% of those born before World War II chose 10, the highest value, but among those born after 1980, only about 30% accorded maximal

importance to living in a democracy. This study also found that in 2011, 24% of those born in the U.S. after 1980 (then in their late teens or early twenties) considered democracy to be a 'bad' or 'very bad' way of running the country. Roberto Stefan Foa & Yascha Mounk, *The Democratic Disconnect*, 27 J. DEMOCRACY 5, 7-8 (2016).,

https://www.journalofdemocracy.org/sites/default/files/Foa%26Mounk-27-3.pdf

37. Most social studies classes in Rhode Island do not discuss social problems and controversial ideas, and opportunities for students to participate in extracurricular activities, service learning, and actual and simulated political experiences are inadequate and tend to be cut back or eliminated in times of fiscal constraint.

38. Most public schools in the United States today, including most schools in Rhode Island, have also failed to help students apply critical thinking to their use of new media. The Stanford History Education Group recently administered a series of assessments that gauge "civic online reasoning" to approximately eight thousand secondary school and college students across twelve states. In one of these exercises, the researchers sent high school and college students to a website that purported to be a fair broker of information on the relationship between minimum-wage policy and employment rates, but, in fact, it was a front for a public relations firm that poses as a think tank. Only 9% of high school students taking Advanced Placement history courses were able to see through the language used on site to determine that its reporting was biased. Among college students the results were actually worse: 93% of students were fooled. Most students never moved beyond the site itself.

Stanford History Educ. Grp., *Evaluating Information: The Cornerstone of Civic Online Reasoning* 4 (2016).

39. The ability of the schools to carry out their historical civic preparation role has been further undermined by the disparities in opportunities for effective civic preparation that are available in many schools with inadequate educational resources. This has resulted in a large "civic empowerment gap" for many African-American and Latino students and for many students from low-income families.  For example, on the 2014 NAEP 8th Grade test in civics, while 32% of white eighth graders performed at or above the proficient level, only 9% of black students and 12 % of Latino students did the same.

40. The results of the schools' substantial failure to prepare students for civic participation are apparent. In 1971, when bi-partisan super-majorities enacted the 26th Amendment to the U.S. Constitution that gave 18-year-olds the right to vote, there was an expectation that young people would enthusiastically take advantage of this important constitutional opportunity.  However, fewer of America's youngest voters have, in fact, exercised their right to vote over the past 50 years, and their voting rates have substantially declined over time. In the 2016 presidential election, only 61.4% of Americans eligible to vote chose to do so, and among younger voters, aged 18-29, the voter turn-out was only 46.1%.  Thomas File, U. S. Census Bureau, Voting in America: A Look at the 2016 Presidential Election, available at https://www.census.gov/newsroom/blogs/random-samplings/2017/05/voting_in_america.html. Americans rank 139th in voter participation out of 172 world democracies. McCormick Tribune Foundation, Civic

Engagement in Our Democracy 6 (2007), available at

http://documents.mccormickfoundation.org/publications/civicdisengagement.pdf.

41. There has also been a substantial decline in knowledge and interest in public affairs. Between 1972 and 2008, the share of people saying they follow "what's going on in government and public affairs" declined from 36% to 26%. Sen. Mike Lee, *What We Do Together: The State of Associational Life in America* 40 (2017).

42. Participation in local civic activities has also plummeted, especially among young people. "[M]embers of the generation born in the 1920s belong to almost twice as many civic associations. . . .The grandparents are . . . twice as likely to work on a community project . . . they are almost three times as likely to read a daily newspaper. (75% vs. 25%)." Robert Putnam, *Bowling Alone: The Collapse and Revival of American Community* 254 (2000).

43. Volunteering among high school and college students nationally has declined since the early 2000s and has remained relatively low and stagnant for the last decade. For the years 2012-2015, only 21% of Rhode Islanders aged 15-24 volunteered to work with organizations that address problems in their communities, and only 23% of Rhode Island adults over age 25 volunteered for such engagements. Both of these volunteer rates are below the national average. Robert T. Grimmand and Nathan Dietz, *Good Intentions, Gap in Action: The Challenge of Translating Youth's High Interest in Doing Good into Civic Engagement*. (Do Good Institute, University of Maryland, 2018), available at

https://www.publicpolicy.umd.edu/sites/default/files/Good%20Intentions%2C%20G ap%20in%20Action_Do%20Good%20Institute%20Research%20Brief.pdf.

## LEGAL BACKGROUND

44. In 1973, the U.S. Supreme Court, held, by a 5–4 vote, that a pattern of substantial disparities in the amount of education funding available to local school districts in Texas was not unconstitutional. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973). The Court held that education is not a "fundamental interest" under the federal Constitution, *Id*. at 29, and, therefore, plaintiffs were not entitled to strict scrutiny of their claim. Despite the acknowledged importance of education, the majority held that education was not a fundamental interest because "the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause." *Id*. at 30. Applying the rational relationship standard, the Court upheld the Texas education finance system despite its inequities after determining that local control of education was a rational state interest.

45. Justice Thurgood Marshall, in a strong dissent, took issue with this position. He argued that although education is nowhere directly mentioned in the Constitution, education must be deemed a fundamental interest because of "the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values." *Id*. at 111 (Marshall, J, dissenting). Specifically, he stressed the importance of education for exercising First Amendment rights, "both as a source and as a receiver of information and ideas," and for exercising the constitutional right to vote and to participate in the political process. *Id*. at 113– 14. *See also id*. at 63 (Brennan, J., dissenting).

46. Justice Powell, writing for the majority, accepted the dissenters' basic perspective.

After summarizing the arguments on this point, he stated:

> We need not dispute any of these propositions. The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote…

However, he also held that the Court did not have to consider this issue in the case

at bar because:

> Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. . . . [In the present case] no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*Id* at 36-37.

47. In short, then, in *Rodriguez*, all of the Justices indicated that some basic level of education may be necessary for students to obtain the essential knowledge and skills they need for "full participation in the political process." Because plaintiffs in that case had not presented specific evidence on what that basic level of education should be and whether the schools attended by the plaintiff children were providing that amount of education, the majority determined that it did not need to decide what "what identifiable quantum of education" students might need to exercise their First and Fifteenth Amendment rights.

48. A number of years later, the Court specifically reiterated that it still had not definitively settled the question of whether a minimally adequate education is a fundamental interest and whether a statute alleged to infringe that right should be

accorded heightened equal protection review. *Papasan v. Allain*, 478 U.S. 265, 284 (1986).

49. The Supreme Court has also underscored the significance of the constitutional right to a trial by jury in both criminal and civil cases, *Duncan v. Louisiana*, 391 U.S. 145 (1968), and the importance of the right of all citizens to serve as jurors: as Justice Kennedy stated for the Court in *Powers v. Ohio*, 499 U.S. 400, 407 (1991), "Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."

50. Since the Supreme Court issued its *Rodriguez* decision in 1973, claims of inequities in education funding have been litigated in state courts in 47 of the 50 states. In approximately 60% of these cases, the state courts have held that there is a right to an "adequate," "thorough and efficient" or "sound basic" education under their state constitutions, and in many of these cases, these courts have held that the states must remedy these inequities. In approximately 40% of the cases, (including Rhode Island), the state courts have held that these adequacy and equity issues are not justiciable or that plaintiffs had not presented sufficient evidence of inequity or inadequacy to justify relief.

51. These state cases constitute a veritable "laboratory of the states" in which the state courts have developed a wide range of legal doctrines and remedies regarding educational adequacy and equity in school funding.

52. Thirty-two of the highest state courts have also specifically held that the primary purpose or a primary purpose of public education is to prepare students to be capable citizens. The highest state courts in the other 18 states have not spoken to this issue;

no highest state court has contested the validity of the proposition that a prime purpose of education is to prepare students for capable civic participation. In none of these cases, however, have the state courts issued orders requiring state officials to take any action to ensure that the schools are, in fact, adequately carrying out their constitutional responsibilities to prepare students to function productively as civic participants.

53. Declaratory and injunctive relief is needed at this time from the federal courts in order to remedy on a uniform basis the national deficiencies in preparing students for civic preparation and the failure of most schools not only in Rhode Island but throughout the country to carry out their responsibilities under the U.S. Constitution to provide *all* students meaningful opportunities to become capable civic participants.


**SPECIFIC ALLEGATIONS**

*Civic Knowledge*

54. In the mid-twentieth century, three civics-related courses were common in American high schools: civics, problems of democracy, and American government. The traditional civics course emphasized the rights and responsibilities of citizens and the ways that they could work together and relate to government. Courses in "problems of democracy" involved discussions of public policy issues. The government class described and analyzed governmental institutions and how they function in a democratic society.

55. Today, students in Rhode Island are not required to take any courses in civics. Although some high schools in relatively affluent districts do offer a civics course as an elective, on information and belief, the majority of schools in Rhode Island do not. For example, although Woonsocket used to offer an elective course in civics, that course was eliminated in 2009 in the wake of the 2008 recession and has not been re-instated since.

56. Rhode Island does not have any state examinations or accountability systems that assess whether students have any knowledge of civics, social studies or American government by the time they graduate from high school.

57. The National Assessment Governing Board, the division of the U.S. Department of Education that oversees the National Assessment of Educational Progress (NAEP), has delineated what it considers to be the key elements of civic education. It has published a "framework" that identifies five major areas of civic knowledge covering America's political institutions, political values, and role in international politics:

- What are civic life, politics, and government?

- What are the foundations of the American political system?

- How does the government established by the Constitution embody the purposes, values, and principles of American democracy?

- What is the relationship of the United States to other nations and to world affairs?

-  What are the roles of citizens in American democracy?

Nat'l Assessment Governing Bd., *Civics Framework for the National Assessment of Educational Progress* 16 (2014).

58. In recent years, many educators and policy organizations have urged states to adopt standards that emphasize higher-order thinking skills and critical analytic approaches to civics and other social studies topics. In 2013, 15 national professional organizations, including the American Bar Association, the American Historical Association, the National Council for the Social Studies, the Campaign for the Civic Mission of Schools, and the Center for Civic Education collaborated in developing "The College, Career and Civic Life (C3) Framework for Social Studies State Standards." The "C3" standards recommend that by the end of twelfth grade, students should, among other things, be able to do the following:

• Analyze the role of citizens in the U.S. political system, with attention to various theories of democracy, changes in Americans' participation over time, and alternative models from other countries, past and present.

• Explain how the U.S. Constitution establishes a system of government that has powers, responsibilities, and limits that have changed over time and that are still contested.

• Evaluate citizens' and institutions' effectiveness in addressing social and political problems at the local, state, tribal, national, and/or international level.

• Apply civic virtues and democratic principles when working with others.

• Use appropriate deliberative processes in multiple settings.

59. Rhode Island has not adopted the C3 standards. Although the social studies standards promulgated by the Rhode Island Education Department (RIDE) do contain some of the learning standards recommended by the NAEP framework and the C3 standards, RIDE has no monitoring or accountability systems in place to ensure that any of these concepts are, in fact, being taught or are being taught effectively in Rhode Island's schools.

60. For the past six years, the position of social studies specialist in the state education department has remained unfilled, reflecting the low priority that the defendants place on implementing their own social studies standards.

61. There is no requirement in Rhode Island that social studies teachers have any knowledge or training in civics or in American government, nor does the state provide any professional development for teachers in these areas.

62. Rhode Island's educational accountability system focuses on schools' performance in reading, math and science and totally neglects monitoring and accountability regarding civics, history, social studies, and economics.

63. All school districts and schools in Rhode Island are required to issue annual report cards informing the public of students' progress in various areas. The mandated report cards in Rhode Island include extensive information regarding student progress in reading and math but no information whatsoever about student performance in civics, history, social studies, and economics.

64. Because of the limited time and resources available for them to meet the needs of their students, and especially of those students with high needs, most school superintendents and principals in Rhode Island focus instruction in their schools on subjects and practices that are mandated and/or tested.

65. On information and belief, most schools in Rhode Island lack sufficient up-to-date books, software and other materials for providing appropriate instruction in civics.

66. On information and belief, the lower status of civics, and history/ social studies, has, in fact, meant that many schools in Rhode Island have in recent years substantially increased the time spent on the mandated subjects of English language arts and math

and reduced the time students spend in instruction in civics and history/social studies.

67. On information and belief, social studies courses as actually taught in most Rhode Island schools do not properly implement the state's own standards and students are exposed to little, if any, of the civics content contained in the standards. For example;

a. The social studies courses that Plaintiff M.S. has taken in high school presented a limited number of formal facts about American governmental institutions, failed to show how these institutions actually do or should function to promote democratic values and did not inform students of how these institutions relate to his future role as an active, informed citizen;

b. Plaintiff A.C. has attended schools in Providence since her elementary years and has never received meaningful instruction in civics or civic values. On information and belief, none of her teachers have been trained or had any education or professional development in the teaching of civics. Neither the state, the school district nor her school has ever required her to take a test or any assessment of her knowledge of civics;

c. Plaintiffs A.F. and R.F. have not received any dedicated civics instruction in the Woonsocket Public Schools throughout their time enrolled.

d. Students with special education needs like Plaintiff I.M. in the Cranston Public Schools do not receive adequate instruction in history, American government and civics or adequate extracurricular experiences geared to their special learning needs that will prepare them to function productively as civic participants as adults.

68. The federal Every Student Succeeds Act (ESSA) requires each state to file a plan that sets forth, *inter alia*, the methods it will use and the priorities it will establish for meeting the needs of educationally disadvantaged students.

69. ESSA requires each state to implement "high-quality student academic assessments" in mathematics, reading or language arts, and science, but not in civics, history, world languages, social studies, economics, or the arts, 20 U.S.C.A § 6311(b)(1)(C) (2015).

70. The ESSA law and regulations do not, however, preclude states from adopting high standards and implementing "quality student academic assessments" in civics, history, economics or social studies or the arts, and, some states have included some or all of those subjects among the priority areas that they will pursue in their educational planning for the foreseeable future.

71. The ESSA plan that Rhode Island filed in March 2018, however, did not include any commitments to improve instruction in civics or to require statewide testing of student knowledge in civics, history, economics or social studies or the arts.

72. Although several litigations have been filed in the Rhode Island state courts seeking enforcement of provisions in the State constitution that require the state to provide an adequate education, the Supreme Court of Rhode Island has on two separate occasions held that such issues are not properly the province of the courts and indicated that plaintiffs should seek a remedy for the educational inadequacies they alleged from the legislature, and not from the courts. *City of Pawtucket v. Sundlun*, 662 A.2d 40 (R.I. 1995), *Woonsocket Sch. Comm v. Chafee*, 89 A.3d 778 (R.I.

2014). Since these cases were decided, the legislative defendants have taken no substantive actions to ensure that adequate resources exist in Rhode Island's schools to ensure that all students are being provided access to an adequate education.

73. In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the U.S. Supreme Court held that states have the authority to "supervise" private schools and to ensure that "teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught and that nothing be taught which is manifestly inimical to the public welfare." *Id* at 534.

74. Although Rhode Island law specifically requires that instruction in private schools shall be "substantially equivalent to that required by this chapter for the public schools," R.I. General Laws § 16-22-2; *see also* R.I General Laws § 16-19-2, on information and belief, the state does not, in fact, monitor the curricula in the private schools and the curricula that is currently being taught in many private schools in the state do not adequately prepare their students for civic participation.


*Civic Skills*

75. Effective political participation requires well-developed verbal skills and cognitive ability, since politics is largely concerned with the utilization and manipulation of language.  The NAEP framework reflects this understanding: the skills it deems most important for students to acquire for civic preparation are those that help citizens identify, describe, explain, and analyze information and arguments. In addition, the framework states that civic participants should be able to evaluate, take,

and defend positions on public policies. Nat'l Assessment Governing Bd., *Civics Framework for the National Assessment of Educational Progress*, 23-26, 31 (2014).

76. Many students in Rhode Island, and especially those attending schools in low-income areas, and many English language learners, do not develop adequate basic verbal skills and do not develop critical analytic abilities because of the poor quality of basic instruction and of instruction in bi-lingual and English as a Second Language (ESL) instruction in these schools. This failing is evidenced by the fact that only 39 % of all Rhode Island students across grades 3-9 achieved proficient scores on the 2017 PARCC statewide achievement test in English language arts. Furthermore, only 22% of African American and Latino students and 23% of low-income students achieved proficient scores on those exams, compared with 49% of White students. Rhode Island Department of Education, *Rhode Island's Statewide Results for Students in Grades 3 through 8 and High School* (2017), available at, http://www.ride.ri.gov/Portals/0/Uploads/Documents/Rhode%20Island's%20Statewide%20Assessment%20Results%202017.pdf.

77. A democratic culture requires citizens to engage substantially in "democratic deliberation," an approach to political conflict and problem solving that emphasizes critical reasoning, thoughtful discussion, and respect for opinions with which one may disagree.

78. Developing skills for deliberative democracy requires exposing students to controversial ideas in the classroom. The teaching of controversial subjects in a non-partisan manner instills in students a sense of the complexity of issues, an exposure to positions different from those the students are likely to encounter at home or

among friends, and a concept of how respectful discussions about these issues with those who hold different views can take place.  It also emphasizes the importance of accurate facts, since students cannot meaningfully engage in political discussions without an agreed factual basis to which competing arguments and values can relate.

79. Because respectful discussions on controversial subjects have become substantially less prevalent in our highly polarized society, it is especially important that students are instructed effectively in the purposes and methods of democratic deliberation while they are in school.  On information and belief, the majority of middle schools and high schools in Rhode Island, however, do not even attempt to promote active classroom discussion of controversial topics and do not, in fact, provide effective instruction in democratic deliberation.

80. A prime reason why democratic deliberation is not taught effectively in most schools in Rhode Island is that the vast majority of teachers in these schools have not been trained in civics in general, and, specifically, have received no training or inadequate training in how to facilitate meaningful conversations on controversial issues in a non-partisan manner and how to develop the skills needed for democratic deliberation in their students.

81. Widespread use of the internet and social media present both major challenges and major opportunities for educators seeking to develop critical reasoning and democratic deliberation skills in students. On the one hand, the digital age has the potential to create a dynamic new public square that motivates young people to engage more deeply with political issues and to develop sharply honed research and deliberative skills. On the other hand, the internet and social media can make it more

difficult to motivate and equip students for civic participation if students use these tools primarily for socializing, entertainment and consumer pursuits, and if they do not understand how facts and opinions can be manipulated and misrepresented on the internet and social media.

82. Educators, therefore, need to develop curricula and instructional practices that motivate and enable all students to make use of the potential of the internet to develop lifelong critical reasoning skills and to use those skills to engage in "deliberative dialogue" on the internet and social media. Although a number of proven techniques exist for accomplishing these ends, effective instruction in "media literacy" is not provided in most Rhode Island schools. This problem is exacerbated in many of the schools in low-income areas by the fact that up-to date computers and other technology are scarce or non-existent in many schools.

83. The plaintiffs attend schools that have out-of-date computers in inadequate numbers to sufficiently provide access to critical educational opportunities necessary to develop the skills for internet and media literacy. Few of the schools that plaintiffs have attended have the necessary databases for appropriate research necessary for civic preparedness.

84. On information and belief, most teachers in Rhode Island have had no training in teaching media literacy skills and most schools in Rhode Island do not have on staff sufficient skilled library media specialists, who are the information specialists best equipped to provide the full range of online information sources and to instruct students in media literacy skills that students need for civic participation. For example, Woonsocket two years ago eliminated one of its library media specialists

in the high school for budgetary reasons. Now there is one library media specialist for 1,700 high school students. Although plaintiffs A.F. and R.F. and other students in their schools are taught how to access the internet, and other computer skills, they and their classmates receive no instruction in how to conduct research effectively on the internet, how to determine the sources of information that they have retrieved on the internet and social media, and whether such information is accurate or misleading.

85. Defendants have recognized the importance of providing opportunities for media literacy to all students by enacting a statute more than a year ago that requires defendant RIDE to "consider, in consultation with national or statewide organizations focused on media literacy, the incorporation of media literacy education into the board of education's basic education program regulations." On information and belief, RIDE has not, however, taken any action to adopt effective media literacy regulations or to ensure that sufficient technological equipment and trained staff are available in all schools to ensure that students have meaningful access to media literacy instruction.

*Civic Experiences*

86. In addition to civic knowledge and civic skills, students need exposure to experiences that show them how politics and government actually work and how civic participation can influence social and political outcomes. Involvement in student government, student newspapers, speech and debate, moot court, service-learning activities, field trips to state legislatures, city councils, local courts and

other actual and simulated civic and political activities provide important
opportunities for learning how political and civic institutions actually function, for
motivating students to become involved in political and civic activities later in life
and for developing civic skills and dispositions.

87. Involvement in student government, student newspapers, speech and debate and
other such activities develop specific listening, speaking, organizing, petitioning, and
tactical skills that students will need to function productively as civic participants
later in life. In addition, these experiences stimulate interest in civic and political
participation, and help students develop a sense of agency and the ability to affect
their environment as well.  There is a substantial correlation between participation in
these activities and voting and participation in a range of civic activities later in life.

88. On information and belief, most schools in Rhode Island provide no opportunities or
only limited opportunities for student involvement in activities that provide civic
experiences. For example, in the schools attended by plaintiffs A.C. in Providence
and I.M. in Cranston, there are no or very limited options such student councils or
other opportunities for student participation in school governance or school affairs,
no or very limited school newspapers, school sponsored speech and debate or moot
court activities. The Woonsocket schools attended by plaintiffs A.F. and R.F.
provide no opportunities for field trips to the state legislature, city council, or courts
and do not offer opportunities for students to engage in school-sponsored service
learning or community engagement activities.

89. In our increasingly diverse society, students also need opportunities to develop inter-
personal skills that will bridge racial, ethnic, political, and cultural differences and

allow them to work harmoniously with others in continuously changing work and community environments. Involvement in co-curricular and extracurricular activities like drama, band, choir, school clubs and athletics provide important opportunities for developing these skills, overcoming stereotypes, learning to respect people from different backgrounds and developing trust. There is a substantial correlation between participation in these activities and voting and participation in a range of civic activities later in life.

90. Most schools in Rhode Island, and especially schools in areas with large numbers of students from poverty backgrounds, provide only limited opportunities for student involvement in co-curricular and extracurricular activities. For example, in the schools attended by plaintiffs A.C. and A.C. in Providence, there is no band, no choir, no opportunities for students to participate in major drama productions, and only limited athletic opportunities.

91. Service learning, an approach that combines community service with classroom discussions and analysis of community service experiences, has been found to have a large positive effect on later civic participation, even when controlling for a range of neighborhood, school, and family characteristics. An effective service-learning program works well because it not only enhances students' skills and interests but changes their fundamental outlooks so that they become -- and see themselves as -- active citizens.

92. Approximately 20 states have requirements for all students to participate in service learning. Although R.I.G.L § 16-22-21 calls upon RIDE to "encourage the establishment of community service learning programs in local school districts," in

fact, only a few schools actually offer these programs because of a lack of teacher training in this area and insufficient resources to allow staff to spend the time necessary to obtain appropriate community placements for students. For example, there are no school-district organized opportunities for service learning or action civics in the schools attended by plaintiffs in Woonsocket, Central Falls, Providence or Cranston.

93. Because of resource deficiencies in schools in low-income areas, there has been an increasing gap in recent years between the experiential and extracurricular opportunities available to students in affluent communities and those from low-income households, many of whom are African-American, Latino or come from low-income areas.

*Civic Values*

94. The NAEP civic framework states that "traits of private character such as moral responsibility, self- discipline, and respect for individual worth and human dignity are essential to the well-being of the American nation, society, and constitutional democracy."  It also emphasizes that "traits of public character, such as public spiritedness, civility, respect for law, critical-mindedness, and a willingness to listen, negotiate, and compromise, are indispensable for the nation's well-being." Nat'l Assessment Governing Bd., *supra* at 30.

95. R.I.G.L §16-12-3, first adopted in 1896, requires each teacher to "cultivate in the minds of all children committed to his or her care the principles of morality and virtue." Neither this statute nor any regulation requires teachers to cultivate civic and democratic values like

respect for the rule of law, equal protection of the laws and tolerance of people with differing views.

96. On information and belief, neither the requirements of R.I.G.L §16-12-3 nor any programs dealing with the democratic values that students need are systematically taught to students in most schools throughout Rhode Island.

*Civic Integration*

97. Demographic trends in the United States and in Rhode Island in particular indicate that the population at large, and the school population in particular, are becoming increasingly diverse. For example, for the United States as a whole, the Black percentage of the population, which was 13.3% in 2016 is expected to increase to 13.8% in 2030 and to 15% in 2060; the Asian percentage, which was 5.7% in 2016 is slated to rise to 6.9 % in 2030 and to 9.1 % in 2060. The fastest growing demographic group in the United States are Latinos who constituted 17.8% of the population in 2016, are expected to rise to 21.1% of the population in 2030 and to 27% in 2060. Jonathan Vespa et al, *Demographic Turning Points for the United States: Population Projections for 2020 to 2060*, U.S. Census Bureau (2018), https://www.census.gov/content/dam/Census/library/publications/2018/demo/P25_1 144.pdf

98. These trends also apply to Rhode Island. For example, in Rhode Island, Latinos, the state's fastest growing demographic group, tripled their numbers since 1990. As of 2016, Latinos constituted 8.9% of the state's population and they are expected to constitute 14.2% by 2032.  William H. Frey et al., *America's electoral future: How Changing Demographics Could Impact Presidential Elections from 2016 to 2032*,

American Enterprise Institute (2016), https://www.aei.org/publication/americas-electoral-future-how-changing-demographics-could-impact-presidential-elections-from-2016-to-2032/

99. In Rhode Island, a fifth of the public schools are more than 90% white. At the same time, 14% of schools are more than 90% students of color. In terms of the percentage of Latino students attending intensely segregated schools, Rhode Island has the sixth most segregated schools among the 50 states.

100. In our highly polarized society, schools continue to be among the only places where people from diverse political and social backgrounds can come together in a setting where values of tolerance and respect for individuals from differing backgrounds continue to be prized and where a democratic community that motivates individuals with differing social, cultural and political views to develop mutual respect and trust can be developed effectively.

101. This "civic integration" role was a prime motivation for the founding of "common schools" in the nineteenth century, and the integrative role of the schools has taken on even greater significance now in the twenty-first century. Civic integration does not require racial or socio-economic quotas, or mandatory school assignments.  It does, however, call upon public officials, policy makers and educators to understand, promote and take advantage of the demographic trends that can support and increase civic integration in the schools.

102. For civic integration purposes, "diversity" includes racial, ethnic, religious, and socio-economic backgrounds, linguistic and disability conditions, gender, sexual orientation and ideological perspectives. Civic integration means taking appropriate

steps, consistent with the requirements of existing federal law, to increase the full range of diversity in the schools throughout the state to the maximum extent feasible and utilizing that diversity to develop a communal ethos in each school that will enhance the civic awareness and civic values of all students.

103. The state defendants have failed to promote effective civic integration. For example, they have failed to adopt policies that could promote civic integration through effective school siting, revising school assignment zones, creating magnet schools and promoting inter-district school transfer programs and housing integration projects. They have also failed to adopt and implement effective policies for ensuring the diversity of the populations in charter schools and in schools for which admission is primarily decided by student choice.

104. Principals, teachers and other staff at many schools in Rhode Island receive no instruction or professional development training on civic integration and in how to create a school ethos that creates a sense of agency in all students, overcomes civic empowerment gaps, and promotes effective inter-personal relations and civic spirit.

105. A positive civic ethos requires all students to feel that they have a stake in the society and in its political system, and that institutions can work for them and their families in the future, even if these institutions have not been fully responsive to their needs in the past.  Such an ethos cannot develop effectively in schools where students are treated unequally or among students who are resentful of the fact that their schools lack important resources and opportunities that students who attend other schools regularly enjoy.

106. Because of the inadequate educational opportunities at the schools attended by many students from low-income backgrounds, a substantial number of these students drop out of school and are ill-prepared to function effectively in our society. For

example, many school dropouts have been rejected for military service because of their inadequate educational backgrounds.

107. In order to be capable voters and jurors and to participate effectively in civic affairs, students who enter school as English language learners need to develop competent English language skills. Substantial numbers of English language learners have enrolled in schools in Rhode Island in recent years, and those numbers are projected to increase markedly in the coming years. For example, in Central Falls, approximately 65% of the students are Latino and 30% are English language learners (ELLs), and in Providence, 67% of the students are Latino and 25% are ELLs.

108. State defendants have failed to provide appropriate programs and services for English language learners. For example, Providence and other districts serving large numbers of English language learners in Rhode Island:

a. Have adopted educational programs that are not educationally sound, such as "consultation models" that place students with general education teachers who consult every few weeks with certified bi-lingual or ESL teachers, in violation of the requirements of *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981).

b. Fail to provide adequate periods of English as a Second Language (ESL) or bilingual programming.

c. Fail to staff their ELL programs with sufficient qualified teachers.

d. Fail to provide sufficient materials to implement ELL programs.

e. Fail to adequately train principals to implement ELL programs.

f. Fail to timely identify all ELLS.

g.  Fail to effectively communicate with many parents with limited English proficiency and fail to properly inform them of their students' rights and educational options.

h.  Fail to provide ELLs equal opportunities to participate in gifted, vocational and special education programs.

i.  Utilize inappropriate exit criteria and fail to properly monitor exited students.

109. Despite these substantial and largely unmet needs, state defendants severely underfund services for ELL students. In total, the state provided only $2.75 million in funding for ELL programs in the current school year's state aid budget, an amount that averages only $250 per student and is grossly inadequate to meet ELL programming needs, especially in the high poverty school districts that have large concentrations of ELL students and minimal ability to raise local funds to meet the intense needs of their students.

110. The lack of meaningful educational opportunities for Latino students in Rhode is a direct cause of grossly unacceptable academic outcomes for these students. For the 2015-206 school year, only 24% of Latino students met 3rd grade expectations in reading, compared with 49% of white students, and 28% of Latino students met 3rd grade expectations in math, compared to 53% of white students.  On the examinations administered by the National Assessment of Educational Progress (NAEP) in 2017, Rhode Island's Latino students ranked 40th in the United States among all Latino students in the nation. The Annie E. Casey Foundation compiles an index score for racial equity for children based on 12 factors such as proficiency scores, young adults who are in school or working, and young adults who have

completed an associate degree or higher. For 2017, Rhode Island's Latino students ranked 49th out of the 49 states for which data was available. Anne E. Casey Foundation, *Race to Results: Building a Path to Opportunity for all Children*, 41 (2017)  http://www.aecf.org/m/resourcedoc/aecf-2017raceforresults-2017.pdf.

111. English Language Learners in Rhode Island – 75% of whom are Latino – are among the lowest performing ELLs in the nation. On the 2017 NAEP exams, Rhode Island ranked 36 out of 37 reporting states in 8th grade reading, and it ranks last out of 39 reporting states in 8th grade mathematics achievement for ELL students.  ELLs in RI also face disturbingly low proficiency levels in urban districts, with 0–1% of ELL students being proficient in some districts and skill categories.  Overall, then, many, if not most, schools in Rhode Island that have substantial numbers of English language learners fail to properly develop their English language skills to a level necessary for them to read and converse in the English language and for them to vote with full knowledge of relevant political issues and to function effectively as civic participants.

112. As set forth in the previous paragraphs, the schools attended by the individual plaintiffs and most other schools in Rhode Island are substantially deficient in terms of the opportunities they provide for students to obtain the civic knowledge, civic skills, civic experiences and civic values that they need to function productively as civic participants. Nevertheless, there are a small number of schools in the state that currently are providing their students an education sufficient to prepare them for capable citizenship in accordance with the requirements of the Constitution of the United States. In these schools, educators have chosen to make education for capable

citizenship a high priority, and the state's education finance systems have provided

them, in contrast to the schools attended by the plaintiffs and the class they

represent, with sufficient resources to provide such education.

113. For example, North Kingstown High School in the affluent North Kingstown

school district provides their 1400 students, only 1% of whom are African American

and 3% of whom are Latino, meaningful opportunities for an education that prepares

them to function productively as civic participants.  The school has a rich curriculum

that includes a robust array of Advanced Placement courses, well-qualified teachers

and small classes. Its student achievement test scores in all subjects and its

graduation rate are substantially above state averages.

114. In North Kingstown, all students must take a "Democracy" course in the 11th or 12th

grade; the course includes substantial opportunities to engage in democratic

community activities. All students must also take two courses in U.S. history.

Electives include "Contemporary History" focusing on the Post-Watergate era,

"Current Issues," "History through Film" and "Law."

115. North Kingstown also has a school wide digital learning program that emphasizes

digital citizenship, the ability to critically assess information obtained through the

media and the use of ethical behavior when accessing technology. The high school

emphasizes student engagement in community activities and actively promotes the

development of specific civic values and a positive school culture. The school offers

a wide range of extracurricular programs, including an active student government,

yearbook, mock trial, band, orchestra, drama, community service, leadership society

(that develops specific civic leadership skills), a wide range of clubs and the largest

athletic program in Rhode Island. As a graduation requirement, all students must complete a senior project, which may consist of a major service experience, an option which is specifically encouraged by the school.

## **CLASS ACTION ALLEGATIONS**

116. The individual named plaintiffs bring this action on their own behalf and, pursuant to Rule 23 (b), Federal Rules of Civil Procedure, on behalf of all other persons similarly situated. The class is composed of all students attending public K-12 schools in  Rhode Island pursuant to the state's compulsory attendance requirements who are not receiving a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, to participate effectively and intelligently in our open political system and to function productively as civic participants due to some or all of the defendants' actions, omissions, laws, policies and practices, as described in this complaint.

117. The class is so numerous that individual joinder of all members is impracticable. The class as defined numbers thousands of persons but the precise number is within the knowledge of defendants and its specific formulation must await discovery and hearing. The state defendants have acted or refused to act on grounds that apply generally to the class, so that final declaratory relief or corresponding injunctive relief is appropriate respecting the class as a whole.

118. This case raises questions of law and fact common to all members of the since the defendants have acted or refused to act on grounds that apply generally to the class, so that final declaratory relief or corresponding injunctive relief is appropriate

respecting the class as a whole.  Common questions of law and fact include, but are not limited to:

a)  Whether because of defendants' actions, omissions, laws, policies and practices, the named plaintiffs and similarly situated students throughout Rhode Island are being denied a meaningful opportunity to obtain the degree of education that is necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech, to participate effectively and intelligently in our open political system and to function productively as civic participants;

b)  Whether defendants have failed to enact appropriate laws, regulations, standards, and to ensure adequate resources, guidance and accountability systems to provide the named plaintiffs and similarly situated students throughout the state appropriate courses, assessments, instruction, experiential opportunities and extracurricular activities that are needed to provide them the civic knowledge, civic skills, civic experiences and civic values that that are necessary and appropriate to prepare them for capable citizenship;

c)  Whether defendants have failed to ensure that teachers throughout the state are sufficiently trained to provide competent instruction in all areas of civic preparation;

d)  Whether sufficient and adequate programs for bilingual and ESL programs for English language learners exist in all schools attended by English language learners in the state;

e)   Whether defendants' actions, omissions, laws, policies and practices, as
described in this complaint violate the rights of the named plaintiffs and the
members of the class under the Fourteenth Amendment, the Sixth and Seventh
Amendments and Article Four, Section Four of the Constitution of the United
States.

119. The claims of the individual plaintiffs are typical of the claims of the class as a
whole. The named plaintiffs all attend schools in various parts of the state that are
not providing them a meaningful opportunity to obtain an education adequate to
prepare them for capable citizenship.  The representative parties will fairly and
adequately protect the interests of the class. Plaintiffs are represented by experienced
counsel who will adequately represent the interests of the class.

120. A class action is appropriate and necessary in this case because prosecution of
separate actions by individual members of the class would create a substantial risk of
inconsistent or varying adjudications with respect to the operation of education
programs in Rhode Island and would preclude a necessary coordinated structural
solution to the common problems. Furthermore, class action designation is necessary
to avoid possible problems of mootness if the course of this litigation should extend
over any appreciable length of time and the individual plaintiffs should become
ineligible for educational services by reason of age, change of residence, or other
circumstances, or if defendants should undertake to meet the educational needs of
the named plaintiffs, without effectively eliminating their systematic violations of
law and without, therefore, remedying the injuries suffered by numerous unnamed
members of the plaintiff class.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

121.  Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through

120.

122. Defendants have violated the equal protection clause of the Fourteenth Amendment

to the United States Constitution and 42 U.S.C. § 1983 by denying to the named

plaintiffs and other members of the plaintiff class their fundamental interest in

receiving a meaningful opportunity to obtain the degree of education that is

necessary to prepare them to be capable voters and jurors, to exercise effectively

their right of free speech, and other constitutional rights, to  participate effectively

and intelligently in our open political system and to function productively as civic

participants.

123. Defendants have violated the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution by denying the named plaintiffs and

other members of the plaintiff class a meaningful opportunity to obtain a basic

education necessary to prepare them to be capable voters and jurors, to exercise

effectively their right of free speech and other constitutional rights, to  participate

effectively and intelligently in our open political system and to function productively

as civic participants, without demonstrating any substantial state interest for doing

so.

124. Defendants have violated the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution, by denying the named plaintiffs and

other members of the plaintiff class a meaningful opportunity to obtain  the degree of

education necessary to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants, without demonstrating any rational relationship to any legitimate state reason for doing so.

<u>SECOND CAUSE OF ACTION</u>

125. Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 124.

126. Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 by denying the named plaintiffs and other members of the plaintiff class their fundamental substantive right to a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

127. Defendants have violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by compelling the individual named plaintiffs and other members of the plaintiff class to attend public schools but failing to provide them while in school a meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants.

<u>THIRD CAUSE OF ACTION</u>

128. Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 127.

129. Defendants have violated the Privileges and Immunities Clause of the Fourteenth

Amendment to the United States Constitution and 42 U.S.C. § 1983 by denying the

named plaintiffs and other members of the plaintiff class their fundamental right to a

meaningful opportunity to obtain an education adequate to prepare them to be

capable voters and jurors, to exercise effectively their right of free speech and other

constitutional rights, to  participate effectively and intelligently in our open political

system and to function productively as civic participants, a right that should be

immune from state abridgement.

## FOURTH CAUSE OF ACTION

130. Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 129.

131. Defendants have violated the Sixth and Seventh Amendments to the United States

Constitution and 42 U.S.C. § 1983,  as well as the requirements of the federal Jury

Selection and Service Act, 28 U.S.C. sec. 186,  by failing to prepare plaintiffs to be

eligible for and to serve effectively on federal and state juries, and have also thereby

denied all named plaintiffs and members of the plaintiff class their rights to be tried

in all criminal and civil cases by a jury of their peers selected at random from a fair

cross section of the community.

## FIFTH CAUSE OF ACTION

132. Plaintiffs repeat and incorporate herein the allegations of paragraphs 1 through 131.

133. Defendants have violated the Republican Guarantee Clause of Article Four, Section

Four of the United States Constitution by failing to provide the individual named

plaintiffs and other members of the plaintiff class a meaningful opportunity to obtain

an education adequate to prepare them to be capable voters and jurors, to exercise effectively their right of free speech and other constitutional rights, to  participate effectively and intelligently in our open political system and to function productively as civic participants capable of maintaining a republican form of government.

## **REQUEST FOR RELIEF**

PLAINTIFFS respectfully request on their own behalf and on behalf of all others similarly situated that this Court:

1. Determine by Order, pursuant to Rule 23 (c) (1), Federal Rules of Civil Procedure, that this action may be maintained as a class action;

2. Enter a final judgment pursuant to 28 U.S. C §§2201, 2202 and Rules 54, 57 and 58, Federal Rules of Civil Procedure,

   a.   Declaring that all students in the United States have a right under the Fourteenth Amendment, the Sixth and Seventh Amendments, and Article 4, Section 4 of  the United State Constitution, and under the Jury Selection and Service Act of 1968 to a meaningful educational opportunity adequate to prepare them to be capable voters and jurors, to exercise effectively all of their constitutional rights, including the right to speak freely, to  participate effectively and intelligently in a democratic political system and to function productively as civic participants in a democratic society; and

   b.   Enjoining the defendants, their successors in office, agents and employees from failing to adopt such laws, regulations policies and practices as are necessary to ensure that the individual plaintiffs and the members of the plaintiff class are

provided meaningful educational opportunities  adequate to prepare them to be

capable voters and jurors, to exercise effectively all of their constitutional rights,

including the right to exercise effectively their rights to speak freely, to

participate effectively and intelligently in a democratic political system and to

function productively as civic participants in a democratic society

3.   Awarding plaintiffs their costs, disbursements, and reasonable attorneys' fees and

expenses pursuant to 42 U.S.C.§ 1988 and any other applicable provisions of law; and

4.  Granting such other alternative or additional relief as the Court may deem just and

proper under the circumstances.


Dated:    November 28, 2018

Respectfully submitted,

/s/ Michael A. Rebell
MICHAEL A. REBELL, Esq.
Center for Educational Equity
Teachers College, Columbia University
Box 219, 525 W. 120th St.
New York, NY 10027
(646)745-8288
mar224@columbia.edu


/s/ Jennifer  L. Wood
JENNIFER L. WOOD  Bar #3582

/s/Jordan Mickman
JORDAN MICKMAN Bar #9761
R.I. Center for Justice
One Empire Plaza, Suite 410
Providence, RI 02903
(401) 491-1101
jwood@centerforjustice.org
jmickman@centerforjustice.org

/s/Stephen Robinson
STEPHEN ROBINSON  Bar # 2103
Robinson & Clapham
123 Dyer Street, Suite 135
Providence, RI  02903
(401) 331-6565
srobinson@smrobinsonlaw.com

/s/ Samuel D. Zurier
SAMUEL D. ZURIER, Esq.
Bar#3576
55 Dorrance St., Suite 400
Providence, RI 02903
(401) 861-0200
sdz@zurierlaw.com

*Attorneys for Plaintiffs*