UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| A.C., a minor by her parent and<br>Guardian ad litem, et. al. | : | |
| | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | **C.A. No.:  1:18-cv-00378-WES-PAS** |
| | : | |
| GINA RAIMONDO, in her official | : | |
| capacity as Governor of Rhode Island | : | |
| et. al. | : | |
| | : | |
| *Defendants.* | : | |

**DEFENDANTS' GINA RAIMONDO, NICHOLAS A. MATTIELLO, AND DOMINICK J.
RUGGERIO, in their official capacities, MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS**

**I.      INTRODUCTION**

Plaintiffs are minors between the ages of pre-school and twelfth grade and have filed this

lawsuit, through a guardian and/or parent, alleging that Defendants have "failed to carry out their

responsibilities under the United States Constitution to provide all students a meaningful

opportunity to obtain an education adequate to prepare them to be capable citizens."  Complaint,

¶ 1.  More specifically, Plaintiffs contend that "[p]olicy makers and educators, including the

defendants in this case, have downgraded the teaching of social studies and civics, focusing in

recent decades on basic reading and math instruction and on the economic value of education to

individual students."  Complaint, ¶ 35.

Plaintiffs cite no legal authority for the federal constitutional right they ask this Court to

adopt and one of the Plaintiffs' attorneys has acknowledged that "in the past the [United States

Supreme] Court has declined to declare the existence of a federal right."   *See* Michael A. Rebell,

*Flunking  Democracy:  Schools  Courts  and  Civic  Participation*  (hereinafter,  "Flunking")

(University of Chicago Press, 2018), at 153.  Despite this noticeable absence of authority recognizing a fundamental right to education – not to mention a fundamental right to a civics-based education – Plaintiffs ask this Court to do something that no other federal court has done in this country's history – recognize a federal constitutional right that all students receive "a meaningful educational opportunity adequate to prepare them to be capable voters and jurors, to exercise effectively all of their constitutional rights * * * and to function productively as civic participants in a democratic society."  Complaint, p. 45.  For the other reasons described herein, Governor Gina Raimondo, Speaker Nicholas A. Mattiello, and President Dominick J. Ruggerio (hereinafter the "State Defendants") ask that this Motion to Dismiss be granted.

## II.   **FACTUAL BACKGROUND**

The facts, as set forth below, are assumed for purposes of this Motion to be true.

There appear to be two students named A.C., one is in 12th grade at Providence Career and Technical Academy and the other is enrolled at the 360 High School in Providence.  Complaint, ¶¶ 13-14.  The latter A.C. is described as "an English Language Learner [who] has received English Language Learner services from the Providence Public Schools."  Complaint, ¶ 14.  According to the Complaint, A.C. – it is not clear which one – "has attended schools in Providence since her elementary years and has never received meaningful instruction in civics or civic values."  Complaint, ¶ 67b.  The Complaint continues that "[o]n information and belief, none of her teachers have been trained or had any education or professional development in the teaching of civics or civic values."  Complaint, ¶ 67b.  "Neither the state, the school district nor her school has ever required [A.C.] to take a test or any assessment of her knowledge of civics."  Complaint, ¶ 67b.  A.C. alleges – again it is unclear which one – that "there are no or very limited options such [as] student councils or other opportunities for student participation in school governance or school affairs, no or very limited school newspapers, school sponsored speech and debate or moot court

activities."  Complaint, ¶ 88.  With respect to both students named A.C., the Complaint asserts "only limited opportunities for student involvement in co-curricular and extracurricular activities," such as "there is no band, no choir, no opportunities for students to participate in major drama productions, and only limited athletic opportunities."  Complaint, ¶ 90.

A.F. and R.F. are students in the 10th and 8th grades, respectively, in the Woonsocket High School Career and Technical Center and in the Woonsocket Middle School.  Complaint, ¶ 15. Neither student has "received any dedicated civics instruction in the Woonsocket Public Schools," Complaint, ¶ 67c; and two years ago, Woonsocket "eliminated one of its [two] library media specialist in the high school for budgetary reasons."  Complaint, ¶ 84.  "Although plaintiffs A.F. and R.F. and other students in their schools are taught how to access the internet, and other computer skills, they and their classmates receive no instruction in how to conduct research effectively on the internet, how to determine the sources of information that they have retrieved on the internet and social media, and whether such information is accurate or misleading."  Complaint, ¶ 84.  A.F. and R.F. are also provided "no opportunities for field trips to the state legislature, city council, or courts and [Woonsocket does] not offer opportunities for students to engage in school-sponsored service learning or community engagement activities."  Complaint, ¶ 88.

Three students named M.S. are identified, one is in the 7th grade at Nathan Bishop Middle School in Providence, another is in the 11th grade at Classical High School in Providence, and another is in the 12th grade at Classical High School in Providence.  Complaint, ¶¶ 18-20.  The only fact asserted on behalf of these three students is that "[t]he social studies courses that Plaintiff M.S. has taken in high school presented a limited number of formal facts about American governmental institutions, failed to show how these institutions actually do or should function to

promote democratic values and did not inform students of how these institutions relate to his future role as an active, informed citizen."  Complaint, ¶ 67a.

I.M. is in the 11th grade at Cranston High School West and is eligible for special education services.  Complaint, ¶ 21.  I.M. contends that students with special needs in Cranston Public Schools "do not receive adequate instruction in history, American government and civics or adequate extracurricular experiences geared to their special learning needs that will prepare them to function productively as civic participants as adults."  Complaint, ¶ 67d.  I.M. also relates that "there are no or very limited options such [as] student councils or other opportunities for student participation in school governance or school affairs, no or very limited school newspapers, school sponsored speech and debate or moot court activities."  Complaint, ¶ 88.  The Complaint contains little to no information concerning the remaining Plaintiffs.[1]

As such, Plaintiffs aver that the failure to provide them "an adequate education for capable civil participation violates their constitutional rights under the Equal Protection, Privileges and Immunities and Due Process Clauses of the Fourteenth Amendment, the Sixth and Seventh Amendments and violates the guarantee that they will live in a state with a republican form of government under Article Four, Section Four of the United States Constitution."  Complaint, ¶ 11.

---

[1] The Complaint only relates: (1) J.R. is in the 2nd grade at the International Charter School in Pawtucket, (2) K.R. is in the 7th grade at the Segue Charter School in Central Falls and is "an English Language Learner and receives English Language Learner services from the Central Falls Public Schools," (3) L.M. is in the 11th grade at Cranston High School West and is eligible for special education services, (4) A.W. "lives in Providence, Rhode Island and has attended public schools in Providence until this year," (5) J.W. is a "pre-school aged student" who "will be enrolled in public schools when he is old enough," and (6) N.X. is in the 12th grade at Classical High School. Complaint, ¶¶ 16-17, 22-25.

### III.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's "well-pleaded facts must possess enough heft to show that [they are] entitled to relief." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008).  In evaluating whether a plaintiff's claims are entitled to relief, the court must accept as true all well-pleaded facts and indulge all reasonable inferences in plaintiff's favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Thus, in judging the sufficiency of a complaint, courts must "differentiate between well-pleaded facts, on the one hand, and 'bald assertions, unsupportable conclusions, periphrastic circumlocution, and the like,' on the other hand; the former must be credited, but the latter can safely be ignored." *LaChapelle v. Berkshire Life Ins.*, 142 F.3d 507, 508 (1st Cir. 1998) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)).  Thus, plaintiffs must rely on more than unsupported conclusions or interpretations of law, as these will be rejected. *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997); *see also Fraternal Order of Police v. Library of Congress*, 692 F. Supp.2d 9, 20 (D.D.C. 2010) ("Because the Court cannot ascertain what the [plaintiff]'s promotion-related claim is, it cannot find that defendants are able to respond to it.").

In *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), the Supreme Court reaffirmed *Twombly* and clarified that two underlying principles guide a court's assessment of the adequacy of pleadings when evaluating whether a complaint can survive a Rule 12(b)(6) motion.  First, the court must identify any conclusory allegations in the complaint as such allegations are not entitled to an assumption of truth. *Id.* at 677-79.  Specifically, the court is not compelled to accept legal conclusions set forth as factual allegations in the complaint. *Id.*  Further, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Peñalbert–Rosa v. Fortuño–Burset*, 631 F.3d 592, 595

(1st Cir. 2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory to the factual."). In other words, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Ocasio–Hernandez v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Second, only a complaint that states a plausible claim for relief can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. The Court explained that "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV.   LEGAL ANALYSIS

### A.   Summary of the Argument

The Plaintiffs' Complaint presumes the existence of a "fundamental" constitutional right to receive an adequate education in the subject-matter of civics or social studies. As such, the State Defendants address the Plaintiffs' argument that such a right is protected by the Due Process Clause (Count II); the Privileges and Immunities Clause (Count III); the Sixth Amendment, Seventh Amendment, and 28 U.S.C. § 1861 (Jury Selection and Service Act) (Count IV); and the Republican Guarantee Clause (Count V). After demonstrating that a fundamental constitutional right does not exist, the State Defendants disprove the Plaintiffs' Equal Protection Clause argument (Count I). Lastly, the State Defendants argue that the Plaintiffs' lack standing with respect to Count IV, fail to join indispensable parties, and fail to state a plausible cause of action against the State Defendants.

### B.   The Due Process Analysis

In determining whether a particular right is protected by the Constitution, the Supreme Court has observed that it:

> does not 'pick out particular human activities, characterize them as 'fundamental,' and give them added protection . . . .' To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.

*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 31 (1973) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 642 (1969)).  Indeed, *Washington v. Glucksberg*, 521 U.S. 702 (1997) examined this constitutional framework in the context of whether a state law prohibiting assisting in a suicide violated the Due Process Clause.

In *Glucksberg*, the Court began its constitutional analysis, "as we do in all due process cases, by examining our Nation's history, legal traditions, and practices."  *Id*. at 710.  After reviewing the practice of suicide and assisting suicide throughout history, the Court elucidated that:

> [o]ur established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," * * * and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. * * * Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible decisionmaking," *Collins, supra,* at 125, 112 S.Ct., at 1068, that direct and restrain our exposition of the Due Process Clause. As we stated recently in *Flores,* the Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." 507 U.S., at 302, 113 S.Ct., at 1447.

*Glucksberg*, 521 U.S. at 720–21 (citations omitted).  Because extending constitutional protection to an asserted right "place[s] the matter outside the arena of public debate and legislative action," the Court has warned that it must "'exercise the utmost care whenever we are asked to break new ground in this field' * * * lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court."  *Id*. at 720 ("we 'ha[ve] always been

reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scare and open-ended'").

Here, while the Plaintiffs assert a constitutional right to receive a meaningful opportunity to obtain a civic-based education adequate to prepare them to function productively as civic participants, such a right or opportunity is not "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id*. at 720-21.  In fact, reaching such a conclusion that public education constitutionally requires civic-based courses as part of a deeply rooted tradition would be impossible since "[t]here was no federal or state-run school system anywhere in the United States as late as 1830." *Gary B. v. Snyder*, 329 F.Supp.3d 344, 366 (E.D. Mich. 2018).  As explained in *Gary B.*, at the time the Constitution was ratified, school districts were formed "when a group of farms came together and decided to construct a public building for schooling, where their children could gather and be taught reading, writing, and moral codes of instruction." *Id*. at 366.  Absent from the subject-matters emphasized in early America were civics-based courses.

In *Rodriguez*, the Court examined an equal protection challenge to Texas' system of financing public education where the plaintiffs claimed that students from wealthier counties received a better overall education than students from poorer counties.  Although the Supreme Court recognized the "undeniable importance of education," *Rodriguez*, 411 U.S. at 18, it nonetheless reversed the District Court's conclusion that the Constitution included a fundamental right to education.  The Court explained:

> the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing.  Nor is it to be found by weighing whether education is as important as the right to travel.  *Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution*.

*Id*. at 33 (emphasis added).  With the analysis properly focused, the Court concluded that "[e]ducation, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is implicitly so protected."  *Id*. at 35.  The Supreme Court has re-affirmed this determination.  *See Plyer v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution.").

While even Plaintiffs' counsel acknowledges that "in the past the Court has declined to declare the existence of a federal right" to education, *see Flunking, supra*, Rebell, at 153, through this lawsuit, Plaintiffs invite this Court not only to reject this binding precedent, but to go a step further and recognize a constitutional right to a particular aspect of education or curriculum, in particular, civics courses and civic experiences.  But if "[p]ublic education is not a 'right' granted to individuals by the Constitution," *Plyer*, 457 U.S. at 221, *a fortiori,* the Constitution most assuredly does not protect a student's right to receive an education in a particular subject-matter or "to function productively as civic participants."  Complaint, ¶ 126.  *See e.g., Mazevski v. Horseheads Central School District*, 950 F.Supp. 69, 72 (W.D. N.Y. 1997) ("because the property interest that exists is in the entire educational process, there is no constitutional right to any one specific curricular or extracurricular activity").

Only months ago, a United States District Court examined whether the Constitution afforded students the right to a minimum level of education *to ensure literacy*.  *See Gary B.*, at 344.  While the course subject-matter in *Gary B*. differed from the course subject-matter in this case – courses to ensure access to literacy versus courses to ensure functionality as civic participants – the core constitutional argument in both cases is similar: without a civic-based education (or without a literacy-based education), plaintiffs and students will not be able to

9

exercise their constitutional rights.  In all relevant purposes, the plaintiffs' argument in *Gary B.* mirrors the instant Plaintiffs core argument:

> [v]oting, participating meaningfully in civic life, and accessing justice require some measure of literacy.  Applying for a job, securing a place to live, and applying for government benefits routinely require the completion of written forms.  Simply finding one's way through many aspects of ordinary life stands as an obstacle to one who cannot read.

*Id*. at 365 ("They aver that by denying Plaintiffs access to literacy, Defendants cosign them to 'instability in both social and economic terms,' and demean them by 'locking them out of valuable social and political institutions, from State academics of higher learning, to the marketplace of ideas, to the very tests that undergird our constitutional democracy.'").

Notwithstanding this argument that without literacy – or in this case a civics-based education – students will be ill-prepared to exercise their constitutional rights, the District Court found no such right in the federal Constitution.  *Id*. at 366 ("[D]oes the Due Process Clause demand that a State affirmatively provide each child with a defined, minimum level of education by which the child can attain literacy?  Based on the foregoing analysis, the answer to the question is no.").  In reaching this result, the District Court relied upon *Glucksberg* and considered whether "liberty nor justice would exist absent state-provided literacy access."  *Id*.  And, as described *supra*, because publicly run school systems did not exist in the United States until 1830, the District Court found no constitutional right to a literacy-based education.  *Id*.

In *Rodriquez*, the Supreme Court also examined an argument similar to the one presented in *Gary B*. and in this case.  The *Rodriguez* Court observed:

> [i]t is appellees' contention, however, that education is distinguishable from other services and benefits provided by the State because it bears a peculiarly close relationship to other rights and liberties accorded protection under the Constitution. Specifically, they insist that education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms and to intelligent utilization of the right to vote. In asserting a nexus between speech and education, appellees urge that the right to speak is meaningless unless the speaker

is capable of articulating his thoughts intelligently and persuasively. The 'marketplace of ideas' is an empty forum for those lacking basic communicative tools. Likewise, they argue that the corollary right to receive information becomes little more than a hollow privilege when the recipient has not been taught to read, assimilate, and utilize available knowledge.

A similar line of reasoning is pursued with respect to the right to vote. Exercise of the franchise, it is contended, cannot be divorced from the educational foundation of the voter. The electoral process, if reality is to conform to the democratic ideal, depends on an informed electorate: a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed.

We need not dispute any of these propositions. The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote. Yet we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most effective speech or the most informed electoral choice. That these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted. These are indeed goals to be pursued by a people whose thoughts and beliefs are freed from governmental interference. But they are not values to be implemented by judicial instruction into otherwise legitimate state activities.

*Rodriguez*, 411 U.S. at 35–36.  Since education in general – and civics based education in particular – is not "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed,'" *Glucksberg*, 521 U.S. at 720-21, Plaintiffs' constitutional argument has no basis in law.

   1. *The Due Process Clause Protects Against Government Intrusion, But Does Not Provide Affirmative Rights*

The Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security," *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989), but contrary to its meaning and purpose, Plaintiffs ask this Court to recognize government's affirmative obligation to provide students a "meaningful education opportunity adequate to prepare them to be capable voters and jurors, to exercise effectively all of their constitutional rights, including the right to speak freely, to participate effectively and intelligently in a democratic political system and to function productively as civil

participants in a democratic society."  Complaint, p. 45.  But there is a "general understanding that 'the Constitution is a charter of negative rather than positive liberties . . . ; [t]he men who wrote the Bill of Rights were not concerned that government might do too little for the people, but that it might do too much to them.'"  *Flunking, supra*, Rebell, p. 166.

To be sure, "the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression,'" *DeShaney*, 489 U.S. at 196, and United States Supreme Court precedent has "recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, *even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual*."  *Id.*  (Emphasis added).  *See also Rodriguez*, 411 U.S. at 38 ("Each of our prior cases involved legislation which 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental personal right or liberty") (rejecting fundamental affirmative right to education).

Here, although Plaintiffs maintain that without a meaningful opportunity for a civics-based education they will be unable to exercise their constitutionally protected rights, "the liberty protected by the Due Process Clause affords protection against *unwarranted government interference . . . it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom*."  *DeShaney*, 489 U.S. at 196 (quoting *Harris v. McRae*, 448 U.S. 297, 317-18 (1980)) (alterations and emphasis in original).  Because Plaintiffs seek the declaration of affirmative constitutional rights – and an injunction against Defendants from failing to enact appropriate laws or regulations to effectuate this right – this Court should be especially reluctant to recognize such a cause of action.  *See Gary B*., 329 F.Supp.3d at 365

("federal courts have demonstrated a reticence to find positive rights to unquestionably important necessities of life").

### 2.  Matters Relating to Education are Committed to the States

In addition to asking this Court to declare an affirmative constitutional right that no federal court in this country has ever recognized, Plaintiffs also suggest that this Court intervene into the classroom curriculum on a national basis and at a granular level.  The Plaintiffs seek a declaration that they have a fundamental right to a "meaningful opportunity to obtain an education adequate to prepare them to be capable voters and jurors, to exercise effectively and intelligently in our open political constitutional rights, to participate effectively and intelligently in our open political system and to function productively as civic participants."  *See* Complaint, ¶ 126.  But nowhere do the Plaintiffs define the "meaningful opportunity" they seek and, as framed, the Complaint suggests that federal courts would now be the arbiter of the "meaningful opportunity" on a national basis.

For instance, the Complaint acknowledges that M.S. has taken social studies courses in high school, but according to the Complaint, these courses "presented a limited number of formal facts about American government institutions [and] failed to show how these institutions actually do or should function to promote democratic values."  Complaint, ¶ 67a.  The Woonsocket schools attended by A.F. and R.F. do not provide "opportunities for field trips to the state legislature, city council, or courts," Complaint, ¶ 88, and the inclusion of this averment suggests Plaintiffs believe the Constitution requires this type of experience.  Elsewhere, Plaintiffs plead that their schools provide "no or very limited" opportunities for student council, school newspapers, band, drama, choir, or moot court activities, again suggesting that the Plaintiffs believe that a federal court should set the minimum bar for such extra-curricular activities.  *See* Complaint, ¶¶ 88, 90.

It is for these very reasons the Supreme Court has stated that "public education in our Nation is committed to the control of state and local authorities," and that "[c]ourts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. State of Arkansas*, 393 U.S. 97, 104 (1968).  As such, "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint," and for which are best left to the province of the states.  *See id.*  at 112 (Black, J., concurring) ("However wise this Court may be or may become hereafter, it is doubtful that, sitting in Washington, it can successfully supervise and censor the curriculum of every public school in every hamlet and city in the United States.").  Because "consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand," *Rodriguez*, 411 U.S. at 58, the federal judiciary should be particularly hesitant to act as a national school board.

### C. Plaintiffs Cannot Bootstrap a Right to a Civics Education into Other Constitutional and Statutory Provisions

#### 1. The Privileges and Immunities Clause and the Republican Guarantee Clause

Under the Privileges and Immunities Clause, "[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. Art. IV, § 2, cl. 1.  But much like the above analysis, the Supreme Court has "long held that the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.'"  *McBurney v. Young*, 569 U.S. 221, 226 (2013).  As discussed, *supra*, there is "no fundamental right to education." *Spath v. National Collegiate Athletic Association*, 728 F.2d 25, 28 (1st Cir. 1984).

Similarly, the Guarantee Clause provides that "*[t]he United States shall guarantee to every State in this Union a Republican Form of Government*, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const. Art. IV, § 4 (emphasis added).  Presumably, Plaintiffs focus on the first (emphasized) clause, but this "portion of the Clause is only implicated when there is a threat to a 'Republican Form of Government.'" *Largess v. Supreme Judicial Court for State of Massachusetts*, 373 F.3d 219, 227 (1st Cir. 2004) ("If there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government.").

Here, the Complaint is devoid of any allegation that the lack of a civics-based education and activities threatens "a government in which supreme power resides in a body of citizens entitled to vote and is exercised by elected officers and representatives responsible to them and governing according to law." *Id*.  A similar line of reasoning was examined – and rejected – in *Rodriguez* where it was argued that the "electoral process, if reality is to conform to the democratic ideal, depends on an informed electorate: a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed." *Rodriguez*, 411 U.S. at 36.[2]  To this argument, the Court observed that it has "never presumed to possess either the ability or the authority to guarantee to the citizenry the most effective speech or the most informed electoral choice." *Id*.  And, the Court added, that while an informed and educated electorate "may be desirable goals of a system of freedom of expression and of a representative form of government," these "are not values to be implemented by judicial intrusion into otherwise legitimate state activities." *Id*.

---

[2] *Rodriguez* did not concern the Guarantee Clause.

Here, no fundamental right is at issue and the Plaintiffs have not demonstrated a real "threat to a 'Republican Form of Government.'" *Largess*, 373 F.3d at 227. The fact that our Republic continues to this day despite public education not being a recognized as a constitutional right, undercuts any "real threat" argument. For these reasons, the Republican Guarantee Clause is also not violated.

### 2. The 6th and 7th Amendments, and the Jury Selection and Service Act, 28 U.S.C. § 1861

Plaintiffs claim that Defendants have violated the 6th and 7th Amendments, as well as the requirements of the federal Jury Selection and Service Act, 28 U.S.C. § 1861, by failing to create some standardized civic education requirement. *See* Complaint, ¶ 130.[3] Plaintiffs theorize that "by failing to prepare plaintiffs to be eligible for and to serve effectively on federal and state juries, [Defendants have] denied all named plaintiffs and members of the plaintiff class their rights to be tried in all criminal and civil cases by a jury of their peers selected at random from a fair cross section of the community." *See* Complaint, ¶ 130. However, neither the 6th or 7th Amendments, nor the federal Jury Selection and Service Act, provide Plaintiffs the relief they seek.

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty

---

[3] In a typographical error, Plaintiffs incorrectly claim that Defendants violated 28 U.S.C. § 186. We assume for purposes of this Motion to Dismiss that Plaintiffs allege a violation of 28 U.S.C. § 1861.

dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." Finally, the Jury Selection and Service Act requires that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. It appears that the Plaintiffs claim that the "impartial jury" requirement of the Sixth Amendment, the "right to a trial by jury" provided by the Seventh Amendment, and the "fair cross section of the community" requirement of 28 U.S.C. § 1861, all require as a prerequisite that citizens obtain a certain level of civics or social studies education.

Put simply, these constitutional or statutory provisions do not provide a right to a trial by jurors with some certain level of educational attainment, in civics or in any other subject.[4]  Beyond requiring jurors to be fair and impartial, our Constitution leaves notably absent any further requirements—not least of which is education.  Indeed, "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community," *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (quoting *Smith v. Texas*, 311 U.S. 128, 130 (1940)).

The Constitution's drafters could certainly have inserted an educational attainment requirement into the Sixth or Seventh Amendments (they themselves comprised a civically-minded segment of the population from which to create a restrictive jury pool), or within 28 U.S.C § 1861, but they did not choose to do so.  Reading such a requirement into the Constitution or

---

[4] To the extent that a lack of civics education may make a juror "unqualified," the Supreme Court has held that "an adequate *voir dire* to identify *qualified jurors*" is sufficient to guarantee a criminal defendant the impartial jury required by the Constitution. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (emphasis added).

federal law, violates all rules of statutory construction.  *See e.g. Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 491 (1st Cir. 2016) ("It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word.").

### a. Plaintiffs Lack Standing to Bring a Case pursuant to the Sixth or Seventh Amendments, or 28 U.S.C. § 1861

Even if Plaintiffs were able to make out a cognizable claim under the Sixth or Seventh Amendments, or 28 U.S.C. § 1861, their case would fail because they lack standing to bring an action related to jury selection. "Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471 (1982) (internal citations and quotation marks omitted). As part of this requirement, a Plaintiff must have standing to assert an action and standing requires an "actual injury redressable by the court." *Id*. at 472 (internal citations and quotation marks omitted).

Standing has multiple aspects, *see Flast v. Cohen,* 392 U.S. 83, 99 (1968) (noting that standing has been called one of the most amorphous concepts in public law, and that "there are at work in the standing doctrine the many subtle pressures which tend to cause policy considerations to blend into constitutional limitations"), but it "has a core component derived directly from the Constitution" that the plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright,* 468 U.S. 737, 751 (1984) abrogated on other grounds by *Lexmark International, Inc. v. Static Control Components, Inc.* 572 U.S. 118 (2014). While the requirements implicit in the concept of "injury" are "not susceptible of precise definition," *id.,* they have been described in terms of whether the plaintiff has a "personal stake in the outcome," and whether the injury in question is

"particular [and] concrete," and whether it results "direct[ly]" from the defendant's actions. *See United States v. Richardson,* 418 U.S. 166, 176-80 (1974) (quotation marks omitted).

The crux of the Plaintiffs' standing problem is, of course, they do not allege any injury whatsoever with regards to jury selection. The Plaintiffs plead no facts that they have been before a jury and they plead no facts that they are presently before a jury. Any injury they may suffer is speculative and inherently not "particular and concrete" because no jury has been empaneled. Whether Plaintiffs will ever be judged by a jury is unknown. *Cf. United States v. Richardson,* 418 U.S. at 179-80 (requiring that plaintiffs have a personal stake in the outcome of the litigation). The hypothetical future jury that Plaintiffs challenge simply does not yet exist, may never yet exist, and thus no one has suffered harm as a result of a jury verdict. As such, there is no "case or controversy" for this Court to hear, and Count Four should be dismissed for lack of standing.

The standing principles bear heightened importance when, as in the present case, the legal issue involves constitutional questions. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105 (1944). The principle of constitutional avoidance is an integral part of the standing – and by extension ripeness – analysis in such cases, and tilts the balance in favor of finding a constitutional issue not timely for review. *See Poe v. Ullman,* 367 U.S. 497, 503-04 (1961). The Plaintiffs' theory of harm as it relates to Plaintiffs' appearing before a jury is untimely, speculative, and inherently indefinite. Thus, the Plaintiffs' claims must be dismissed.

### 3. The State Defendants' Educational System Passes Rational Basis

Plaintiffs also allege a violation of the Equal Protection Clause on two grounds: (1) Defendants deprived the Plaintiffs of a fundamental right, *i.e.*, a meaningful opportunity to obtain an education necessary to function productively as civic participants, without any substantial state interest for doing so, *see* Complaint, ¶¶ 122-123, and (2) Defendants denied Plaintiffs a meaningful opportunity to obtain an education necessary to function productively as civic participants devoid of any rational relationship. *See* Complaint, ¶ 124. Because the Plaintiffs have not been deprived of a fundamental interest, *see supra*, the Equal Protection Clause analysis focuses on rational basis review.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). As such, "[a] plaintiff must therefore adequately plead that the government treated him or her 'disparately as compared to similarly situated persons and that such disparate treatment * * * has no rational basis." *Gary B.*, 329 F.Supp.3d at 367. Here, Plaintiffs' Complaint contains no allegation concerning the appropriate class or that Plaintiffs were treated "'disparately as compared to similarly situated persons.'" *Id*. On this basis alone, Plaintiffs' equal protection claim must fail.

Notwithstanding the Plaintiffs' failure to identify the appropriate class, the Supreme Court has explained rational basis review "requires only that the State's system be shown to bear some rational relationship to legitimate state purposes." *Rodriguez*, 411 U.S. at 40. As the Court explained in *Rodriguez* when it examined the manner in which Texas raised and disbursed revenue for education, "this case [] involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels

20

against premature interference with the informed judgments made at the state and local levels." *Id*. at 42. "The very complexity of the problems of financing and managing a statewide public school system," the Court warned, "suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect." *Id*. "In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." *Id*. at 43.

Like other states, Rhode Island values local control of its educational system to meet the needs of its community. *See id*. at 49 ("While assuring a basis education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level. In an era that has witnessed a consistent trend toward centralization of the functions of government, local sharing of responsibility for public education has survived.").

For example, Rhode Island law provides that:

- [t]he entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns,' [and that such school committees shall have the power to] 'develop educational policies to meet the needs of the community' [and to] 'approve a master plan defining goals and objectives of the school system * * * in terms of what men and women should know and be able to do as a result of their education experience, R.I. Gen. Laws § 16-2-9(a)(2) and (7);

- [t]he school committee shall make and cause to be put up in each schoolhouse rules and regulations * * * for the introduction and use of textbooks and works of reference, and for the instruction, government, and discipline of the public schools, and shall prescribe the studies to be pursued in the schools, under the direction of the department of elementary and secondary education, R.I. Gen. Laws § 16-2-6; and

- [t]he general assembly recognizes the importance of a citizenry well educated in the principles of democracy as enunciated in the constitutions of the state of Rhode Island and the United States. The general assembly directs the board of regents for elementary and

secondary education to develop and adopt a set of grade level standards K-12 in civics education no later than August 31, 2007. These standards shall include, but not be limited to, the history of the state of Rhode Island, representative government, the rights and duties of actively engaged citizenship, and the principals of democracy. These civic education standards shall be used in the public schools of this state beginning in kindergarten and continuing through to and including grade 12. No private school or private instruction shall be approved for the purposes of chapter 19 of this title unless the course of study shall make provision for instruction substantially equivalent to that required by this chapter for public schools.  R.I Gen. Laws § 16-22-2.

The importance of local control over education decisions in the Equal Protection Clause context was recognized in *Rodriguez* where the Court noted that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society." *Rodriguez*, 411 U.S. at 49 (alteration in origin) (quoting *Wright v. Council of the City of Emporia*, 407 U.S. 451 (1972)).  *Rodriguez* continued that "'[l]ocal control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well.'"  *Id*. (alteration in original) (quoting *Wright v. Council of the City of Emporia*, 407 U.S. at 478 (Burger, C.J., dissenting, joined by Blackmun, Powell, and Rehnquist, JJ)).  And, as *Rodriguez* recognized in concluding that Texas' method of public education financing passed rational basis review:

> [e]ach locality is free to tailor local programs to local needs.  Pluralism also affords some opportunity for experimentation, innovation, and a healthy competition for educational excellence.  An analogy to the Nation-State relationship in our federal system seems uniquely appropriate.

*Id*. at 50.  On this basis, the Court concluded that Texas "may be justified in believing that other systems of school financing, which place more of the financial responsibility in the hands of the State, will result in a comparable lessening of desired local autonomy."  *Id*. at 52-53 ("That is, they may believe that along with increased control of the purse strings at the state level will go increased control over local policies.").

Here too, "[t]he constitutional standard under the Equal Protection Clause is whether the challenged state action rationally furthers a legitimate state purpose or interest." *Id*. at 55. But Plaintiffs have not pointed to similarly situated students who are treated differently, nor have Plaintiffs identified any irrational or non-legitimate state act. Rather, Plaintiffs allege in a conclusory manner that the Defendants have failed to demonstrate "any rational relationship to any legitimate state reason." Complaint, ¶ 124.

Similar to *Rodriguez*, however, the Rhode Island General Assembly has recognized the importance of local control when it comes to developing and implementing curriculum. *See supra*. Decision making at the local level is important because, in large part, the members of the local community will also be financially responsible for the cost of education and because "[n]o area of social concern stands to profit more from a multiplicity of viewpoints and from a diversity of approaches than does public education." *Rodriguez*, 411 U.S. at 50. By ensuring that curricula decisions are made on a state and local level – rather than at a federal level – states and communities can best decide the courses that should be taught in local schools and communities; and these local schools and communities can adjust their curriculum based upon emerging technology and trends. For example, 20 or 30 years ago, it would have been imaginable for schools to teach computer and internet skills. Today, computer literacy is as fundamental as any other aspect of education. Allowing for experimentation at the local level has allowed for this flexibility and even A.F. and R.F. acknowledge that they are "taught how to access the internet, and other computer skills." Complaint, ¶ 84.

Ensuring education-related decisions are made at the local level through local education agencies, *see infra*, allows local schools to teach the values and emerging issues important to the community. In this respect, the United States Supreme Court has recognized its "full agreement *

* * that local school boards must be permitted 'to establish and apply their curriculum in such a way as to transmit community values,' and that 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.'" *Board of Education v. Pico*, 457 U.S. 853, 864 (1982). Local participation and approval is also necessary since education expenses will be paid by taxpayers and education decisions must ultimately be implemented by taxpayers and families. *See e.g., Cary v. Board of Education*, 598 F.2d 535, 543 (10th Cir. 1979) ("It is legitimate for the curriculum of the school district to reflect the value system and educational emphasis which are the collective will of those whose children are being educated and who are paying the costs."). To be sure, a civics-based education is an important aspect of education – as is math, reading, and any number of other subjects; and Rhode Island law reflects this importance. But a constitutional mandate that particular subjects be taught or certifications required has no place within the constitutional framework and, if recognized, begs the question what other aspects of education must also be constitutionally recognized. Rhode Island's approach satisfies rational basis review.

### D. The State Defendants are Not the Proper Defendants and Should be Dismissed, and Indispensable Parties are Not Included

The Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(7) because the Plaintiffs have failed to join necessary parties in accordance with Fed. R. Civ. P. 19, and in fact have sued the wrong parties. In Rhode Island, local school committees and other local educational agencies ("LEAs"),[5] not the Defendants, are vested by the General Assembly with the

---

[5] "LEAs," which are not limited to school committees, are defined in the state's Basic Education Program Regulations (the "BEP"), 200-RICR-20-10-1.5(R), as:

a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for public elementary or secondary schools in a city, county, township,

"entire care, control, and management of all public school interests of the several cities and towns." R.I. Gen. Laws § 16-2-9(a). Indeed, although Plaintiffs ask this Court to enjoin Defendants from "failing to adopt such laws, regulations policies and practices as are necessary to ensure that the individual plaintiffs * * * are provided meaningful educational opportunities * * * to function productively as civil participants,"[6] the General Assembly has already directed "the board of regents for elementary and secondary education to develop and adopt a set of grade level standards K-12 in civics education no later than August 31, 2007." R.I. Gen. Laws § 16-22-2. These standards shall include the history of the state of Rhode Island, representative government, the rights and duties of actively engaged citizenship, and the principals of democracy. *Id*. Thus, the Plaintiffs' claims should have been made against the local school committees or other LEAs that actually are responsible for civics curricula within their jurisdictions.[7]

---

school district, or other political subdivision of a State, or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools.

[6] As described herein, Rhode Island has no restriction on the General Assembly's plenary power to enact civics-related curriculum, and in fact, the General Assembly has done so. *See supra*. Accordingly, by seeking to enjoin the General Assembly from enacting such legislation, Plaintiffs seek a non-existent remedy. To the extent that Plaintiffs may ask this Court to direct the General Assembly to enact certain legislation, such a remedy would implicate federalism principles, including but not limited to anti-commandeering. *See Murphy v. National Collegiate Athletic Association*, ___ U.S. ___, 138 S.Ct. 1461, 1477 (2018) ("Congress may not simply 'commandee[r]' the legislative processes of the states by directly compelling them to enact and enforce a federal regulatory program.'").

[7] If Plaintiffs had properly named the local school committees and LEAs, they would have been required to exhaust available administrative remedies and the proper venue would likely be state court. Rhode Island General Laws § 16-39-1 provides that:

[p]arties having any matter of dispute between them arising under any law relating to schools or education may appeal to the commissioner of elementary and secondary education who, after notice to the parties interested of the time and place of hearing, shall examine and decide the appeal without cost to the parties involved.

Rule 19 governs whether a party is indispensable to a lawsuit.    It works in two steps. "Step one requires the district court to decide whether a person fits the definition of those who should be joined if feasible under Rule 19(a)." *Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 134 (1st Cir. 1989) (internal citations and quotation marks omitted). "If the person is a necessary party (i.e., fits the definition of 19(a)), but joinder is not feasible, the court must take step two. It must decide, using four factors [laid out in Fed. R. Civ. P. 19(b)] whether, in equity and good conscience the action should proceed among the parties before it, or should be dismissed." *Id.* (internal citations and quotation marks omitted).

The LEAs and local school committees are clearly indispensable to this lawsuit. The General Assembly has vested the "entire care, control, and management of all public school interests of the several cities and towns . . . in the school committees of the several cities and towns," R.I. Gen. Laws § 16-2-9(a); the local school committees and LEAs—not the State Defendants—are therefore responsible for school curricula, for the specific teaching methods employed in each classroom, and for the professional development of teachers. Because the Plaintiffs request relief related to educational areas within the power of the local school committees and LEAs rather than the State Defendants to provide, those other parties must be joined to efficiently adjudicate this matter.  *See Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 134 (1st Cir. 1989) (a "court essentially will decide whether considerations of efficiency and fairness, growing out of the particular circumstances of the case, require that a particular person be joined as a party"); *Acton Co., Inc. of Massachusetts v. Bachman Foods, Inc.,* 668 F.2d 76, 78 (1st

---

The Commissioner's decision is then subject to an appeal to the Council, and eventually to the Rhode Island Superior Court.  *See* R.I. Gen. Laws §§ 16-39-3 and 16-39-4.

Cir.1982) (noting that Rule 19 "furthers several related policies, including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete relief in a single action, and the interest of absentees in avoiding" prejudice).  Indeed, because of the local school committees' and LEAs' control over the elements of the school system with which the Plaintiffs take issue, the State Defendants are not even the cause of Plaintiffs' alleged harm, and they therefore should be dismissed as improper parties. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (noting that to have standing to sue a defendant, a plaintiff's injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.") (internal citations and quotation marks omitted).  Thus, the LEAs and local school committees must be joined to this lawsuit, and State Defendants should be dismissed.

> E. *Plaintiffs Provide Only Conclusory Allegations That Do Not Satisfy the Iqbal/Twombly Standard*

Moreover, although Plaintiffs contend that Defendants have failed to provide the requisite meaningful opportunity to access education necessary to function productively as civic participants, Plaintiffs' Complaint does no more than plead this conclusion without providing "well-pleaded facts" sufficient to demonstrate a cause of action.  *See e.g., Clark*, 514 F.3d at 112. Defendants' position is supported by *Rodriguez*, wherein the Court related:

> [e]ven if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short.  Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where – as is true in the present case – no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*Rodriguez*, 411 U.S. at 37.  Rather than evidencing a system that fails to provide each student with an opportunity to acquire basic minimal skills necessary to participate in the political or civic process, Plaintiffs' Complaint evidences a mix of allegations that demonstrate Defendants do provide the requisite opportunities as well as "threadbare recitals" insufficient to state a plausible cause of action.  *See Iqbal*, 556 U.S. at 677-79.

For example, Plaintiffs plead that A.C. and K.R. are "English Language Learner[s]" and that both A.C. and K.R. have received "English Language Learner services" from the Providence Public Schools and Central Public Schools, respectively.  Complaint, ¶¶ 14, 17.  Although two years ago, Woonsocket "eliminated one of its [two] library media specialist [positions] in the high school for budgetary reasons," Plaintiffs' Complaint makes clear that Woonsocket still staffs a library media specialist in its high school.  Complaint, ¶ 84.  Plaintiffs also aver that "A.F. and R.F. and other students in their schools are taught how to access the internet, and other computer skills[,]" Complaint, ¶ 84; and that M.S. has taken social studies classes in high school but has been presented "a *limited* number of formal facts about governmental institutions, failed to show how these institutions actually do or should function to promote democratic values and did not inform students of how these institutions relate to his future role as an active, informed citizen."  Complaint, ¶ 67a.  Even if a "quantum of education is a constitutionally protected" right, these allegations fall well short of demonstrating that "the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process."  *Rodriguez*, 411 U.S. at 37.[8]

---

[8] As noted in footnote 1, *supra*, six named Plaintiffs have little to no facts associated with their education experience.

To be sure, the carefully-worded Complaint does allege that A.C. has not received "*meaningful* instruction in civics or civic values," Complaint, ¶ 67b (emphasis added), and that there are "*no or very limited* options such [as] student councils * * * school sponsored speech and debate or moot court." Complaint, ¶ 88 (emphasis added).  Later, the Complaint alleges that there are also "only *limited* opportunities for student[s] involved in co-curricular and extracurricular activities," such as "there is no band, no choir, no opportunities for students to participate in major drama productions, and only limited athletic opportunities."  Complaint, ¶ 90 (emphasis added).

Other deliberately-crafted allegations contend that A.F. and R.F. have not received "any *dedicated* civics instruction," Complaint, ¶ 84 (emphasis added), that A.F. and R.F. have not been provided "opportunities for field trips to the state legislature, city council, or courts," Complaint, ¶ 88; or that I.M. has not received "*adequate* instruction in history, American government and civics or adequate extracurricular experiences geared to their special learning needs that will prepare them to function productively as civic participants as adults."  Complaint, ¶ 67d (emphasis added).

But even if it were "conceded that some identifiable quantum of education is a constitutionally protected" right, *Rodriguez*, 411 U.S. at 37, Plaintiffs' conclusory allegations do no more than recite the elements of a cause of action they assert to exist.  *See Twombly*, 550 U.S. at 555.   Further, the State Defendants are unaware of any legal authority recognizing a constitutionally protected right to engage in a particular form of extra-curricular activity.  *See e.g., Spath v. National Collegiate Athletic Association*, 728 F.2d 25, 28 (1st Cir. 1984) ("There being no fundamental right to education * * * there could hardly be thought to be a fundamental right to play intercollegiate hockey.") (citation omitted); *Mazevki v. Horseheads Central School District*, 950 F.Supp. 69, 72 (W.D. N.Y. 1997) ("plaintiffs have cited no case which stands for the

proposition that a student has a protected property interest in participating in a particular class or extracurricular activity"). Indeed, if Plaintiffs' argument were to prevail and this Court recognized a protected right to receive an education (and extra-curricular activities) in a particular subject-area, it would redefine decades of due process case law.

In *Mazevski*, 950 F.Supp. at 70, for example, a student who missed a mandatory performance sued after being dropped from the Marching Band. After referencing United States Supreme Court precedent (*Goss v. Lopez*, 419 U.S. 565 (1975)), the District Court explained that "the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Id*. at 72. The court explained:

> [t]he property interest in education created by the state is participation in the entire process. The myriad activities which combine to form that educational process cannot be dissected to created hundreds of separate property rights, each cognizable under the Constitution. Otherwise, removal from a particular class, dismissal from an athletic team, a club or any extracurricular activity, would each require ultimate satisfaction of procedural due process.

*Id*. at 72 (quoting *Dallam v. Cumberland Valley School District*, 391 F.Supp. 358 (M.D. Pa. 1975)). As such, the court concluded that exclusion from a particular course or event requires no due process and that if the rule were otherwise, "every disgruntled student (or, more likely, disgruntled parent) who believed she should not have been dropped from the pep squad, or who believed he should not have been benched for missing a team meeting, or who challenged his failure to be selected to take advance placement courses, could commence an action in federal court to challenge the decision of the school's administrators." *Id*. at 73. *See e.g., Seamons v. Snow*, 84 F.3d 1226, 1234-35 (10th Cir. 1996) ("With regard to the specific components of education which Brian claims were lost (e.g., the right to participate in sports, to take advanced placement classes, and to attend a particular school), we do not believe that Brian has a

constitutional right to those particular incidents of education.  We have interpreted *Goss* to speak only in general terms regarding the 'educational process.'").  This Court should reject Plaintiffs' attempt to dissect the educational process into separate constitutional rights.

## V.    CONCLUSION

For all these reasons, the State Defendants' Motion to Dismiss should be granted.

PETER F. NERONHA
ATTORNEY GENERAL

STATE DEFENDANTS

*/s/ Michael W. Field*
*/s/ Mariana E. Ormonde*
*/s/ Andrea S. Shea*
*/s/ Keith Hoffmann*
Michael W. Field, No. 5809
Assistant Attorney General
Mariana E. Ormonde, No. 8873
Andrea M. Shea, No. 9702
Keith Hoffmann, No. 9874
Special Assistant Attorneys General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2380/2250/2231/1882
mfield@riag.ri.gov
mormonde@riag.ri.gov
ashea@riag.ri.gov
khoffmann@riag.ri.gov

## CERTIFICATION

I, the undersigned, hereby certify that I filed the within document via the ECF filing system and that a copy is available for viewing and downloading.  I have also caused a copy to be sent via the ECF System to counsel of record on this 20th day of March, 2019.

_/s/ Karen M. Ragosta_