UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                              )
A.C., a minor by her parent   )
and guardian ad litem, et al.,)
                              )
        Plaintiffs,           )
                              )
    v.                        )          C.A. No. 18-645 WES
                              )
GINA RAIMONDO, et al.,        )
                              )
        Defendants.           )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, District Judge.

I.  Introduction[1]

        Several  Rhode  Island  public  school  students  have  filed  a

putative  class  action  in  this  Court  through  their  guardians  or

parents,  alleging  violations  of  their  constitutional  rights

because  the  State  of  Rhode  Island  (the  "State")  is  not  providing

them  with  an  adequate  civics  education.   They  are  residents  of

Rhode  Island  enrolled  in  public  schools  across  the  state  in  grades

_____

        [1]  Before  the  Court  are  two  Motions  to  Dismiss  Plaintiffs'
Complaint.   Ken Wagner in his official capacity as Commissioner of
Education  of  the  State  of  Rhode  Island,  the  Rhode  Island  State
Board  of  Education,  and  the  Council  on  Elementary  and  Secondary
Education  ("Education  Defendants")  filed  a  Motion  to  Dismiss.
("Ed. Defs.' Mot."),  ECF No. 23.    Defendants Gina Raimondo,
Nicholas  A.  Mattiello,  and  Dominick  J.  Ruggerio  ("Government
Defendants")  also filed a separate Motion to Dismiss ("Gov't Defs.'
Mot."),  ECF No. 25.   Plaintiffs  filed  an  objection  to  both  Motions
in  one  filing  ("Pls.'  Opp'n"),  ECF No. 28,  and  Defendants  filed
separate replies, ECF Nos. 34 and 35.

seven through twelve, as well as one preschool-aged student who will eventually be enrolled in public school. See Compl. ¶¶ 13-25. Some Plaintiffs have received English Language Learner ("ELL") services or special education services from the Providence Public Schools. Id. ¶¶ 14, 17, 21.

These students allege that various public officials have failed to provide them and other similarly situated students with "an education that is adequate to prepare them to function productively as civic participants capable of voting, serving on a jury, understanding economic, social, and political systems sufficiently to make informed choices, and to participate effectively in civic activities." Id. ¶ 4. The students contend that this failure violates their constitutional rights under the Equal Protection, Privileges and Immunities, and Due Process Clauses of the Fourteenth Amendment; the Sixth and Seventh Amendments and the Jury Selection and Service Act; and the Republican Guarantee Clause of Article Four. Id. ¶ 11-12.

They claim that Defendants have "downgraded the teaching of social studies and civics, focusing in recent decades on basic reading and math instruction" and have also "neglected professional development of teachers in civics education." Id. ¶ 35. In addition to the total lack of, or at least inadequate, civics instruction, they also point to "limited opportunities for student involvement in co-curricular and extracurricular

activities", the elimination of "library media specialists", "no opportunities for field trips to the state legislature, city council, or courts", "no or very limited options . . . for student participation in school governance or school affairs, [and] no or very limited school newspapers, school sponsored speech and debate or moot court activities." Id. ¶¶ 84, 88, 90.

By way of remedy, the students ask this Court to "[d]eclar[e] that all students in the United States have a right under the [Constitution] . . . to a meaningful educational opportunity" that will adequately prepare them to be "capable" voters and jurors, as well as to exercise all of their constitutional rights and function as "civic participants in a democratic society[.]" Id. at 45-46. Plaintiffs also ask this Court to "[e]njoin[] the defendants . . . from failing to adopt such laws, regulations[,] policies and practices as are necessary to ensure" that those educational opportunities are provided. Id.

This is an ambitious lawsuit. It asks this Court to declare rights that have not been recognized by the Supreme Court of the United States, or, with a single exception, any other federal court in recent history. There is a long tradition of efforts like these designed to use litigation to rectify wrongs, redirect government priorities, and pursue public policy objectives that, for one reason or another, have not been achieved through legislative or executive action. Indeed, policies involving education have been

the subject of some of the most important litigation in the country's history.  The use of litigation for these purposes, however, is certainly not without controversy.  See generally Gerald N. Rosenberg, The Hollow Hope: Can Courts Bring About Social Change? (1991); David A. Schultz, Leveraging the Law: Using the Courts to Achieve Social Change (1998).

Earlier this year, a divided panel of the U.S. Court of Appeals for the Sixth Circuit[2] issued a compelling and scholarly opinion, with an equally compelling dissent, finding that there is in fact a fundamental right to a "basic" adequate education, and specifically a "foundational level of literacy", in the U.S. Constitution's substantive due process guarantee.  Gary B. v. Whitmer, 957 F.3d 616, 642 (6th Cir. 2020), vacated 958 F.3d 1216 (2020).  The Gary B. case concerned a challenge to the adequacy of the education provided in the Detroit public school system.  Id. at 620-21.  For the reasons explained below, as strong a case as the Gary B. majority panel makes that there is, in fact, a

_____

[2]  After the Sixth Circuit panel issued its opinion, the full court voted sua sponte to rehear the case en banc, vacating the panel opinion.  See Gary B. v. Whitmer, 958 F.3d 1216 (6th Cir. 2020).  The court thereafter dismissed the case as moot after receiving word the parties had settled.  Appellants' Mot. to Dismiss the Case as Moot, Gary B. v. Whitmer, Nos. 18-1855/1871 (6th Cir. 2020).  Thus, the Gary B. panel opinion is effectively a legal nullity.  While this Court recognizes this fact, it is nonetheless a vigorous exposition of the competing points of view surrounding the primary issues in this case.  For that reason, the decision is discussed throughout this Opinion.

substantive due process right to a basic education from a historical and policy point of view, it is insufficient to deflect Defendants' Motions here.

It is true that the Supreme Court has sent mixed messages about education over the decades; and while the Court's occasionally opaque statements about education may be due to the shifting ideological bent of the Court, the arc of the law in this area is clear.  So, there is little doubt that Plaintiffs' claims must be dismissed.  But while this lawsuit must be dismissed, it is worth pausing, before explaining why, to acknowledge the importance of Plaintiffs' effort here.  This case does not represent a wild-eyed effort to expand the reach of substantive due process, but rather a cry for help from a generation of young people who are destined to inherit a country which we — the generation currently in charge — are not stewarding well.  What these young people seem to recognize is that American democracy is in peril.  Its survival, and their ability to reap the benefit of living in a country with robust freedoms and rights, a strong economy, and a moral center protected by the rule of law is something that citizens must cherish, protect, and constantly work for.  We would do well to pay attention to their plea.  At the same time, there is a lot for the student Plaintiffs to learn from this case.  The path of Supreme Court holdings that leads inevitably to the conclusion that this case must be dismissed is

a civics lesson all its own, one worth contemplating as well in these fraught times.  It is a path not just of the law in the abstract, but, to paraphrase Justice Holmes, of practical experience.[3]

A.  Democracy in Peril

In recent years, scholars and commentators have warned of the impending threats to democracy in the United States and around the world.  In How Democracies Die, Professors Steven Levitsky and Daniel Ziblatt of Harvard describe democratic regimes across the world that have fallen to authoritarian rule, including Venezuela, Hungary, Peru, Ecuador, Turkey, and more.  Steven Levitsky and Daniel Ziblatt, How Democracies Die 2-6 (2018).  The authors describe four key indicators of authoritarian behavior: "1. Rejection of (or weak commitment to) democratic rules of the game; 2. Denial of the legitimacy of political opponents; 3. Toleration or encouragement of violence; 4. Readiness to curtail civil liberties of opponents, including media." Id. at 23-24.  Levitsky and Ziblatt describe numerous norms of political behavior that keep the American democratic system in place, the so-called "guardrails of democracy".  See id. at 97-117.  These rules of the game are not written into our Constitution but are the unwritten — and universally understood — norms of behavior that allow us to

---

[3]  See Oliver Wendell Holmes, The Path of the Law, 10 Harvard L.R. 457 (1897).

govern and to be governed.  See id.  Two of the most crucial, they argue, are mutual toleration (i.e., the idea that rivals can agree to disagree and not let every difference become a fight to the death) and institutional forbearance (i.e., the notion that political leaders will not use every drop of their power under the law to achieve their goals if to do so would violate the spirit of the law).  See id. at 102-17.  (A prominent historical example of institutional forbearance is the unwillingness of even popular presidents like Washington, Jefferson, Jackson, and Grant to seek a third term in office before the passage of the Twenty-Second Amendment).  See id. at 107-09.  The authors describe the erosion and collapse of these norms across the American landscape.  See id. at 145-203.  It is both these hallmarks of democracy and concomitant democratic norms that, in effect, Plaintiffs here suggest are missing from the civics education of our young people — not just education about the mechanisms of our democratic system, but its spirit; about what it means to be an American and even what America means.

We are a society that is polarized as much as any time in our history; we live in echo-chambers of cable television news shows, Twitter feeds, and YouTube videos.  And political leaders, driven further and further to their extremes by their increasingly

extremist constituencies, appear more willing to break through the soft guardrails of democracy to achieve their ends.[4]

Even as this Opinion was being prepared, the President tweeted that perhaps the presidential election should be delayed because of perceived "voter fraud". This prompted a swift and strong rebuke from all quarters,[5] including from one prominent conservative legal scholar who called this behavior fascistic, and deserving of immediate impeachment and removal from office. See Steven G. Calabresi, Trump Might Try to Postpone the Election. That's Unconstitutional. (July 30, 2020), https://www.nytimes.com/2020/07/30/opinion/trump-delay-election-coronavirus.html. Perhaps such an extreme suggestion by the President momentarily stiffened the guardrails of democracy; but the existential problem of creeping authoritarianism will not

---

[4]    See generally Cass Sunstein, Going to the Extremes: How Like Minds Unite and Divide (2009).

[5]    See, e.g., Alexander Bolton, McConnell rebuffs Trump suggestion, says election will be held 'on time', The Hill (July 30, 2020, 1:09 PM), https://thehill.com/homenews/senate/509806-mcconnell-rebuffs-trump-suggestion-says-election-will-be-held-on-time; Amy Gardner et al., Trump encounters broad pushback to his suggestion to delay the Nov. 3 election, The Wash. Post (July 30, 2020, 8:35 PM), https://www.washingtonpost.com/politics/trump-floats-idea-of-delaying-the-november-election-as-he-ramps-up-attacks-on-voting-by-mail/2020/07/30/15fe7ac6-d264-11ea-9038-af089b63ac21_story.html; Zeke Miller & Colleen Long, Trump floats idea of election delay, Sununu says no way, Concord Monitor (July 30, 2020, 3:15 PM), https://www.concordmonitor.com/Trump-floats-November-election-delay-Sununu-says-no-way-35483941.

subside after one Tweet storm.  In the aftermath of the killing of George Floyd in Minneapolis, and with a global pandemic rocking the economy, families, and every aspect of our social and cultural lives, the country is riven with dissention and violence.  Murder and violent crimes are increasing in large metropolitan areas.[6] And basic public health protocols, like wearing face masks in public places, have become political litmus tests leading to more infection spread and death.  And worse yet, forces of anarchy and political desperation cynically stoke these fires of division to pursue or retain power.  As we watch all this unfold in real time before our eyes — shootings of protestors and federal security guards; federal troops using extreme tactics; passers-by screaming racial epithets at a man peacefully holding a Black Lives Matter sign[7]; burning and vandalizing of courthouses (just to name a few) — one could reasonably wonder if the American experiment can

---

[6]  See, e.g., Paul G. Cassell, Explaining the Recent Homicide Spikes in U.S. Cities: The 'Minneapolis Effect' and the Decline in Proactive Policing, Federal Sentencing Reporter (forthcoming 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3690473; see also John Eligon, Shaila Dewan and Nicholas Bogel-Burroughs, In the Wake of Covid-19 Lockdowns, a Troubling Surge in Homicides, N.Y. Times (Aug. 11, 2020, updated Aug. 24, 2020), available at https://www.nytimes.com/2020/08/11/us/homicides-crime-kansas-city-coronavirus.html; Michael Barbaro, A Surge in Shootings, The Daily (Aug. 24, 2020).

[7]  See Holding a Black Lives Matter Sign in America's Most Racist Town (July 27, 2020), https://www.youtube.com/watch?time_continue=2&v=ltmlvk9GAto&feature=emb_logo.

survive it all.  As historian Anne Applebaum, in her new book Twilight of Democracy: The Seductive Lure of Authoritarianism, says,

> It might be a turning point.  Maybe my children and their friends — all of our friends, and all of us, really, who want to go on living in a world where we can say what we think with confidence, where rational debate is possible, where knowledge and expertise are respected, where borders can be crossed with ease — represent one of history's many cul-de-sacs. We may be doomed, like glittering, multiethnic Habsburg Vienna or creative, decadent Weimar Berlin, to be swept away into irrelevance.  It is possible that we are already living through the twilight of democracy; that our civilization may already be heading for anarchy or tyranny, as the ancient philosophers and America's founders once feared; that a new generation of clercs, the advocates of illiberal or authoritarian ideas, will come to power in the twenty-first century, just as they did in the twentieth; that their visions of the world, born of resentment, anger, or deep, messianic dreams, could triumph.  Maybe new information technology will continue to undermine consensus, divide people further, and increase polarization until only violence can determine who rules.  Maybe fear of disease will create fear of freedom.

Anne Applebaum, Twilight of Democracy: The Seductive Lure of Authoritarianism 185-86 (2020).  Or, Applebaum wonders, perhaps the pandemic will be a tipping point toward global cooperation, recognition of the importance of science and rejection of hucksters, liars, and demagogues.  See id. at 186.  Either way, it will be a choice.

Across the political spectrum, while sounding the alarm regarding the perilous state of our country in this moment, many see reason to hope. But survival of our democracy, as they point out, will not happen just because we want it to; we will have to work for it, struggling not only against the haunting ghosts of our nation's past, but against new forces of illiberalism, anti-intellectualism, and authoritarianism — from social media trolls, to conspiracy theories like Q-Anon,[8] to Russian interference in our election,[9] and even the siren call of nostalgia for the good old days.[10] Our leaders must, of course, do this by respecting the rules of the game and the rule of law and appointing judges who, to paraphrase Chief Justice John Roberts, are neither Republican nor Democrat, but women and men doing their level best to follow

---

[8]   See Adrienne LaFrance, The Prophecies of Q, The Atlantic (June 2020), https://www.theatlantic.com/magazine/archive/2020/06/qanon-nothing-can-stop-what-is-coming/610567/.

[9]   See generally Report of the Select Committee on Intelligence, United States Senate, On Russian Active Measures Campaigns and Interference in the 2016 U.S. Election Volume 5: Counterintelligence Threats and Vulnerabilities, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf; see also Catherine Belton, Putin's People: How the KGB Took Back Russia and Then Took On the West (2020); Anne Applebaum, A KGB Man to the End, The Atlantic (Sept. 2020), https://www.theatlantic.com/magazine/archive/2020/09/catherine-belton-putins-people/614212/.

[10]   See generally Yuval Levin, The Fractured Republic: Renewing America's Social Contract in the Age of Individualism (2017).

the rule of law; and, to bring it back home to this case — we need to educate our younger generation, the ones who will inherit the mess we are making and ultimately be responsible for the success or failure of American democracy for generations to come.

B.  Correcting Course

Larry Diamond, a senior fellow at the conservative Hoover Institution and prolific author and commentator on politics and the future of democracy, notes,

> Political scientists know quite a bit about the conditions that make democracy more likely to thrive.  One key condition is wealth, but not just any form of it. . . .  [W]hen countries become wealthy through the gradual expansion of private enterprise, small businesses, and the rule of law, a far healthier dynamic takes hold.  Income and wealth are more fairly distributed.  Levels of education and knowledge steadily rise.  Social capital grows alongside financial capital. The landscape becomes thick with professional associations, interest groups, unions, cultural organizations, anticorruption watchdogs, mass media, and universities. Under such conditions, these different groups may clash, even intensely, over policies, but they will respect one another's right to exist. . . .  Education is particularly key here.  When people are educated at least through high school, it broadens their outlook on life.  They become more tolerant of differences and nuances.  This inclines them to become more active, informed, and rational citizens, and thus restrains them from being seduced by extremists.

Larry Diamond, <u>Ill Winds: Saving Democracy from Russian Rage, Chinese Ambition, and American Complacency</u> 30-31 (2020).

And, to put an even finer point on it, as A.C. Grayling, Professor of Philosophy at the New College of Humanities in London, argues in Democracy and Its Crisis that compulsory education in civics (along with compulsory voting) is a critical step that could be crucial in reconfiguring the place of politics in the national community.  Grayling argues:

> No form of democracy can protect itself either from degenerating into ochlocracy or being hijacked by a hidden oligarchy – of money, big business, the arms industry, partisan groups intent on hijacking the system for their own benefit only – unless the enfranchised are informed and reflective.  The first defence against both is a thorough understanding of the institutions and practices of the democratic order and the government it licenses.  This means understanding the constitution, the political process, the extent and limits of legislative and executive competence, the responsibilities and role of the enfranchised themselves, and the political opportunities of the populace as a whole.

A.C. Grayling, Democracy and Its Crisis 161 (2017).  The call for reform is coming not only from the scholarly community and think tanks.  Leaders of the judicial branch too have signaled the need for civic leaders (including federal judges and court staff) to help educate our young people on civic values and institutions.  For example, Chief Justice Roberts devoted his most recent annual Year-End Report on the Federal Judiciary to this challenge, saying,

> [W]e have come to take democracy for granted, and civic education has fallen by the wayside. In our age, when social media can instantly spread rumor and false information on a grand

13

> scale, the public's need to understand our
> government, and the protections it provides,
> is ever more vital.  The judiciary has an
> important role to play in civic education, and
> I am pleased to report that the judges and
> staff of our federal courts are taking up the
> challenge.  By virtue of their judicial
> responsibilities, judges are necessarily
> engaged in civic education. As Federalist No.
> 78 observes, the courts "have neither FORCE
> nor WILL, but merely judgment."  When judges
> render their judgments through written
> opinions that explain their reasoning, they
> advance public understanding of the law.

2019 Year-End Report on the Federal Judiciary 2 (Dec. 31, 2019),

https://www.supremecourt.gov/publicinfo/year-end/2019year-

endreport.pdf.

The Chief Justice went on to discuss how courts and judges do

more than just publish opinions; indeed, many courts, including

this District, devote thousands of hours to teacher education,

online and written course materials, and efforts to bring students

into the courthouse to observe proceedings and meet with lawyers,

judges, and court personnel.  Judge Robert Katzmann of the U.S.

Court of Appeals for the Second Circuit has been another judicial

leader in this effort.  He has created a learning center in the

Thurgood Marshall U.S. Courthouse, convened a conference of judges

and court staff to facilitate collaboration on civics education,

and developed a program on the subject.[11]  And there is more.  As

---

[11]   See Justice for All: Courts and the Community,
https://justiceforall.ca2.uscourts.gov/ (last visited October 9,
2020).

14

Chief Justice Roberts points out, from retired Justice Sandra Day O'Connor's iCivics non-profit, to individual judges who volunteer their time as tutors, to the National Constitution Center in Philadelphia replete with interactive exhibits and videos,

> Civic education, like all education, is a continuing enterprise and conversation. Each generation has an obligation to pass on to the next, not only a fully functioning government responsive to the needs of the people, but the tools to understand and improve it.

See 2019 Year-End Report on the Federal Judiciary 3-4.

These efforts point out how concerned members of the judiciary are about the erosion of the civic values and norms described above. As the third branch, with neither the power of the purse nor an army to compel compliance, the judiciary relies entirely upon the public's respect for our democratic institutions and the rule of law. When that respect crumbles, the guardrails fail and democracy dies. To avoid this fate, we must not only teach our young people the mechanics of our civic institutions, but why they matter in the context of American democracy. That is, we must do the hard work of confronting our national history and how it informs who and what we are as a nation.

As historian Jill Lepore writes in her short book, This America: The Case for the Nation (a follow up essay to her much heralded one-volume history of the United States, These Truths), "Nations, to make sense of themselves, need some kind of agreed-

upon past.  They can get it from scholars or they can get it from demagogues, but get it they will."  Jill Lepore, This America: The Case for the Nation 19-20 (2019).  As she recounts, historians in recent times have shied away from writing about the history of the nation with its institutional slavery, Indian wars, segregation, misguided foreign wars and the like for "fear of complicity — complicity with the atrocities of U.S. foreign policy and complicity with regimes of political oppression at home."  Id. at 119.  When the real historians fade from the front, the demagogues move in.  The most popular "history" books in recent years are written by the likes of disgraced cable television commentator Bill O'Reilly whose "Killing" books ("Killing Lincoln", and so on) have sold millions of copies.

Lepore makes the case that historians must return to the study of America as a nation, a task filled with difficulty because our history is so full of contradiction and dysfunction.  "But the United States, rebuked by all those left out of its vision of the nation, began battling that contradiction early on, and has never stopped.  In the United States, the nation is the battle."  Id. at 42.  If we are to resist effectively the renewed calls to a dangerous nationalism and authoritarianism, if we are to save the notion of American democracy, then we must embrace a new Americanism, one based in history and values and shared experience:

> This America is a community of belonging and
> commitment, held together by the strength of
> our ideas and by the force of our
> disagreements.  A nation founded on universal
> ideas will never stop fighting over the
> meaning of its past and the direction of the
> future.  That doesn't mean the past or future
> is meaningless, or directionless, or that
> anyone can afford to sit out the fight.  The
> nation, as ever, <u>is</u> the fight.
>
> * * *
>
> A new Americanism would rest on a history that
> tells the truth, as best it can, about what W.
> E. B. DuBois called the hideous mistakes, the
> frightful wrongs, and the great and beautiful
> things that nations do.  It would foster a
> spirit of citizenship and environmental
> stewardship and a set of civic ideals, and a
> love of one another, marked by benevolence and
> hope and a dedication to community and
> honesty.  Looking both backward and forward,
> it would know that right wrongs no man.

<u>Id.</u> at 136-37.

This is what it all comes down to: we may choose to survive as a country by respecting our Constitution, the laws and norms of political and civic behavior, <u>and</u> by educating our children on civics, the rule of law, and what it really means to be an American, and what America means.  Or, we may ignore these things at our and their peril.  Unfortunately, this Court cannot, for the reasons explained below, deliver or dictate the solution — but, in denying that relief, I hope I can at least call out the need for it.

II.   Legal Standard

When, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, "dismissal for want of jurisdiction is based solely on the complaint", courts must "accept the well-pleaded factual averments contained therein and indulg[e] all reasonable inferences in the [plaintiff's] favor." Gordo-Gonzalez v. United States, 873 F.3d 32, 35 (1st Cir. 2017) (internal citation and quotation marks omitted).   Similarly, a motion to dismiss under Rule 12(b)(6) requires courts to view the facts contained in the pleadings in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. See Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).   To survive the motion, however, a plaintiff must present "factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'"   Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).   Put another way, "[w]hile detailed factual allegations are not required, 'a formulaic recitation of the elements of a cause of action' is not sufficient." DeLucca v. Nat'l Educ. Ass'n of Rhode Island, 102 F. Supp. 3d 408, 411 (D.R.I. 2015) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).   The same is true of a motion brought pursuant to Rule 12(b)(7), see McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 151 (D.D.C.

2014), through which a party may move to dismiss for failure to join an indispensable party.

III.  Discussion

A.  Jurisdiction[12]: Joinder, Standing, and Nonjusticiable Political Question

Defendants first raise three flaws they say require dismissal: failure to join necessary parties, failure to demonstrate standing, and the presence of a nonjusticiable political question.  But, for the most part, none do.

Defendants challenge the Court's jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201-2, saying Plaintiffs have not joined the necessary parties under Rule 19 of the Federal Rules of Civil Procedure.  Defendants argue that Plaintiffs' allegations should have been made against "the local school committees and other [Local Educational Agencies ("LEAs")] . . .

---

[12]  In passing, the Education Defendants also ask the Court to decline to exercise its jurisdiction based on two abstention doctrines.  See Ed. Defs.' Mot. 42-43.  They first argue Burford abstention is appropriate because the Court, in deciding this case, is interfering with a state administrative scheme.  See generally Burford v. Sun Oil Co., 319 U.S. 315 (1943); see also Ed. Defs.' Mot. 43.  Next they try Pullman abstention, arguing that, in accordance with this doctrine, "state court[] resolution of unclear state law would obviate the need for a federal constitutional ruling", and so this Court should not weigh in. See Pustell v. Lynn Pub. Sch., 18 F.3d 50, 53 (1st Cir. 1994) (citing Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941)).  But really neither theory translates to this case; as Plaintiffs point out, no state administrative agency procedure is at play and there is no open issue of state law, meaning neither theory applies, and abstention is not warranted.  See Pls.' Opp'n 64.

that actually are responsible for the civics and social studies curricula, and for the manner by which the subjects are taught in . . . schools within their jurisdictions." Ed. Defs.' Mot. 11. The Education Defendants[13] also challenge Plaintiffs' Article III standing to bring suit, and particularly whether Plaintiffs sufficiently show redressability. Id. at 15-17; see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (explaining that the requested relief "must be 'likely', as opposed to merely 'speculative', and provide redress for the alleged injury).

　　　　i.　Joinder

To begin, Defendants fundamentally mischaracterize the thrust of Plaintiffs' Complaint, which alleges that the failure to properly prepare students to meaningfully participate in a democratic and civil society is a failure at the State level. While Plaintiffs do point to various local issues such as the lack of civics-related field trips or individual school newspapers, their underlying claim is grounded in the State Defendants' failure to make civics education a priority. See Compl. ¶ 35 (alleging that "[p]olicy makers and educators, including the defendants in this case, have downgraded the teaching of social studies and civics"); id. ¶ 112 (describing a "small number of schools in the

---

　　　　[13]　While the Government Defendants argue Plaintiffs lack standing only as to Count IV, see Gov't Defs.' Mot. 18-19, the Education Defendants argue Plaintiffs lack standing as to all counts, see Ed. Defs.' Mot. 13-17.

state . . . [where] educators have chosen to make education for capable citizenship a high priority").

Defendants have the authority to implement policy and educational priorities, and could, if directed by a federal court, make civics education a priority. See R.I. Const. Art. 12 § 1 (recognizing "[t]he diffusion of knowledge, as well as virtue among the people" as "essential to the preservation of their rights and liberties," and that it is the State's responsibility to "promote public schools and . . . secure to the people the advantages and opportunities of education"); see also R.I. Gen. Laws §§ 16-97-1, 16-97-1.2 (describing the creation of the State Board of Education as successor to the Board of Regents); R.I. Gen. Laws §§ 16-60-2, 16-60-4 (outlining the "powers and duties" of the Council on Elementary and Secondary Education, including to "formulate broad policy to implement the goals and objectives established and adopted by the board of regents; [and] to adopt standards and require enforcement"). The Rhode Island education authorities also retain control over assessing whether the LEAs are complying with State standards,[14] and thus can ensure that the stated policies

---

[14] The General Assembly has delegated authority over educational standards to the Council on Elementary and Secondary Education and the Commissioner of Education, and the Council has in turn promulgated the Basic Education Program ("BEP") which assesses whether the LEAs are complying with State education standards. See Pls.' Opp'n 6-14.

are implemented and enforced.[15]  <u>See</u> Pls.' Opp'n 12-13 (arguing that Defendants have failed to adequately assess the performance of the LEAs' programs in civics education and social studies, compared to the more rigorous statewide assessment of students' literacy and math skills).[16]

Thus, since Plaintiffs' Complaint is directed at the broad, policy-making authority of the State Defendants, the LEAs are not required parties under Rule 19(a)(1).[17]

---

[15]  The fact that the General Assembly previously directed the Board of Regents to develop and adopt grade level standards for civics education by August 31, 2007, does not support Defendants' argument.  R.I. Gen. Laws § 16-22-2; <u>see also</u> State Defs.' Mot. 25.  Rather, it reinforces the fact that the General Assembly does hold oversight authority over education in Rhode Island, as well as the ability to set priorities and implement them.

[16]  Defendants argue that it would be difficult to implement a remedy requiring civics education due to lack of measurable standards.  This is a red herring.  While the Court need not decide the appropriate remedy, it is clear that standards could be identified.  For example, a test like the U.S. citizenship test could be used, or the already-existing National Assessment of Educational Progress ("NAEP") Civics Assessment.  <u>See</u> U.S. Citizenship and Immigration Services, Civics (History and Government Questions for the Naturalization Test, www.uscis.gov/sites/default/files/document/questions-and-answers/100q.pdf; <u>see also</u> National Assessment of Educational Progress (NAEP Civics Assessment), www.nces.ed.gov/nationsreportcard/civics; Wisconsin Civics Graduation Requirement, https://dpi.wi.gov/social studies/laws/civics.

[17]  And, in light of this conclusion, the Court need not address Defendants' claim that, if the "local school committees and other responsible LEAs" are added to the case, Plaintiffs fatally failed to exhaust administrative remedies as to them pursuant to R.I. Gen. Laws § 16-39-1.  Ed. Defs.' Mot. 12; <u>see</u> Gov't Defs.' Mot. 25-26 n.7.

ii.  Standing

Plaintiffs have sufficiently alleged facts demonstrating standing for most of their claims: they have pleaded specific injuries with concrete allegations of the denial of civics education and the specific harms these denials impose on Plaintiffs, see Compl. ¶¶ 65-67, 80-84, 88, 90-93; and a connection between Defendants' alleged failure to adopt and enforce statutes and regulations requiring civics education and Plaintiffs' claimed injuries, see id. ¶¶ 103-6, 108-16. See Lujan, 504 U.S. at 560-61.

Moreover, Plaintiffs have sufficiently alleged that their requested remedy — a declaration and injunction directing Defendants to honor that right — would "likely" provide redress for their injury, and thus have demonstrated standing to sue. See Lujan, 504 U.S. at 561 (noting that "on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim") (internal citation and quotation marks omitted).

Plaintiffs, however, have not adequately pleaded an injury with respect to Count IV, which alleges violations of the following: the Sixth and Seventh Amendments, and the Jury Selection and Service Act.  They allege Defendants violate these

> by failing to prepare plaintiffs to be
> eligible for and to serve effectively on
> federal and state juries, and have also

23

> thereby denied all named plaintiffs and
> members of the plaintiff class their rights to
> be tried in all criminal and civil cases by a
> jury of their peers selected at random from a
> fair cross section of the community.

Compl. ¶ 131.  But Plaintiffs fail to plead a present injury; instead, in defending the claims, Plaintiffs refer only to wholly hypothetical harms.  See Pls.' Opp'n 18-19 n.7.  This is of course inadequate.  See Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) ("The injury must either have happened or there must be a sufficient threat of it occurring to be actual or imminent.").

### iii. Nonjusticiable Political Question

Last, the Education Defendants attempt to characterize this action as a nonjusticiable political question, see Ed. Defs.' Mot. 44-45, but none of the relevant considerations, see Baker v. Carr, 369 U.S. 186, 217 (1962) (listing considerations), weigh in favor of that conclusion.  For example, "[Baker's] first decisional factor", which deserves "dominant consideration", weighs "whether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department' of government and what is the scope of such commitment."  Com. of Mass. v. Laird, 451 F.2d 26, 31 (1st Cir. 1971) (quoting Baker, 395 U.S. at 521). Here, the Education Defendants do not persuasively point to any such commitment.

24

And none of the other considerations support this result either; the Court disagrees with the suggestion that this case requires "micromanaging the public school curricula", see Ed. Defs.' Mot. 45-46 (arguing in support of the second and third Baker considerations), and neither does Plaintiffs' prayer for relief "invit[e] . . . endless litigation" while impeding on the Legislature's discretion, see Ed. Defs.' Mot. at 46-47 (arguing in support of the fourth, fifth, and sixth Baker considerations). This is thus not a nonjusticiable political question, and the Court, having dispelled these threshold arguments, proceeds to consider the heart of this case.

B.  Fourteenth Amendment and Civics Education

    i.  Brief Historical Background

There can be little doubt that education has been regarded as an important civic responsibility from the time of the country's founding.  George Washington, in his farewell address, famously penned by Alexander Hamilton, said:

> Promote then, as an object of primary importance, institutions for the general diffusion of knowledge.  In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened.

George Washington's Farewell Address, 1796; see also Ron Chernow, Alexander Hamilton 505-08 (2004); One Last Time on Hamilton

Broadway      Cast      Recording      (Atlantic      2015),
https://open.spotify.com/album/1kCHru7uhxBUdzkm4gzRQc.

Education, and particularly civics education, has been a
fundamentally important value throughout our nation's history
because it is the foundation of an informed citizenry that can
effectively participate in a republican form of government.  In
her book Looking for Rights in All the Wrong Places: Why State
Constitutions Contain America's Positive Rights 73-74 (2013),
Emily Zackin explains that the Founders shared Plaintiffs'
concerns:

> Anxiety about the character of the citizenry
> originated with the American Revolution itself
> and the sense that the new republic was
> engaged in a dangerous experiment, which
> required an educated citizenry . . . .
> [P]ublic education in America has long been,
> and continues to be, understood not only as a
> means of elevating the individual and
> preparing him for the responsibilities of
> citizenship, but also of protecting the
> republic itself.

This is why, she explains, the education reform movement "often
focused on the social value of school systems, rather than (or in
addition to) the individual's claim on society."  Id. at 74.

But despite the Founders' importuning to future generations
regarding the need for an educated citizenry, public schools were
not established nationwide until the mid-1800s.  The genesis of
public schools in America can be traced to mass immigration from
Europe in the early to mid-1800s.  Irish immigrants, eager to

preserve both their faith and nurture their communities, formed parochial schools in their parishes.  And German immigrants, who arrived in greater numbers, but who were less destitute, suffered less prejudice, and tended to move further inland, similarly built German churches and schools.  All of this, points out Jill Lepore in These Truths, contributed to the growing movement to establish taxpayer-supported elementary schools known as "common schools." Jill Lepore, These Truths 209 (2018).

Lepore recounts how the common school movement was animated by the desire to assimilate disparate cultures and build civic awareness and moral responsibility:

> Much of the movement's strength came from the fervor of revivalists.  They hoped that these new schools would assimilate a diverse population of native-born and foreign-born citizens by introducing them to the traditions of American culture and government, so that boys, once men, would vote wisely, and girls, once women, would raise virtuous children. "It is our duty to make men moral," read one popular teachers' manual, published in 1830. Other advocates hoped that a shared education would diminish partisanship.  Whatever the motives of its advocates, the common school movement emerged out of, and nurtured, a strong civic culture.

Id. at 210.  During this period of the emergence of common schools, it was the states, often at the heavy-handed encouragement of the federal government, that began to recognize that education was not just an important civic goal, but indeed a right.

Judge Jeffrey Sutton, an appellate judge on the U.S. Court of

Appeals for the Sixth Circuit, in his book <u>51 Imperfect Solutions:</u> <u>States and the Making of American Constitutional Law</u>, recounts the history of the common school movement this way:

> At the founding, there were no statewide systems of public schools, and if there were schools at all, they were privately run or haphazardly organized at the local level. Sparked by the leadership of Horace Mann and the "Common Schools" movement he launched in Massachusetts, States in the mid-nineteenth century began to authorize their cities and counties to organize schools that would offer free public education.  In the words of Mann: "Education then, beyond all other devices of human origin, is a great equalizer of the conditions of men — the balance wheel of the social machinery."  To that end, many States amended their constitutions, requiring the legislature (in the words of many a state constitution) to create a "thorough and efficient" system of public schools.

Jeffrey Sutton, <u>51 Imperfect Solutions: States and the Making of</u> <u>American Constitutional Law</u> 27 (2018) (internal citations omitted).

By 1868, thirty-six out of thirty-seven states "imposed a duty in their constitutions on state government to provide a public-school education."  Steven G. Calabresi & Sarah E. Agudo, <u>Individual Rights Under State Constitutions When the Fourteenth</u> <u>Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in</u> <u>American History and Tradition?</u>, 87 Tex. L. Rev. 7, 108 (2008). In the post-Reconstruction era, Congress conditioned southern states' re-admission to the Union on the inclusion of a right to

education in their state constitutions.[18]  Zakin, supra, at 75.

Both sides in this litigation argue that this history supports their positions: Plaintiffs see it as evidence that by 1868 education was "deeply rooted in the Nation's history and traditions", while Defendants argue that when it comes to education, the "deeply rooted tradition" was one of local control, as it was the state constitutions that included the right to education, not the U.S. Constitution.[19]  See Ed. Defs.' Mot. 18; see also Pls.' Opp'n 40-41.

> ii.  Is Education a Fundamental Right under the U.S. Constitution?[20]

Is education, and more specifically "civics education", a fundamental right under the U.S. Constitution?  In San Antonio Independent School District v. Rodriguez, 411 U.S. 1 (1973), the Supreme Court stated that "[e]ducation, of course is not among the rights afforded explicit protection under our Federal

---

[18]  However, a proposal to require every state's constitution to guarantee the establishment of a free school system as a condition for readmission to the Union was narrowly defeated. Zakin, supra, at 75.

[19]  The Court disagrees with the Government Defendants that Plaintiffs pleaded only conclusory allegations necessitating dismissal as to them.  See Gov't Defs.' Mot. 27.

[20]  Plaintiffs, as they must, assert that civics education is fundamentally grounded in the U.S. Constitution; because this conclusion is imperative for both the equal protection and substantive due process claims, the Court analyzes its foundation in the Constitution before turning to each claim's nuances.

Constitution.  Nor do we find any basis for saying it is implicitly so protected." 411 U.S. 1, 36 (1973) (emphasis added).  Plaintiffs attempt to work around this plain statement by pointing to dicta in the majority's opinion that "[e]ven if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of [the individual's right to speak and to vote], we have no indication that the present levels of educational expenditures in Texas provide an education that falls short . . . ." Pls.' Opp'n 2 (quoting Rodriguez, 411 U.S. at 36-37).  Plaintiffs say the Court did not address, and left for another day, the question of whether a subset of basic education — civics education — is guaranteed by the Constitution; they say that they have presented in their Complaint the evidence that was lacking in Rodriguez — "evidence that would allow the Court to consider the 'quantum of education' that might be necessary for students to be prepared for the 'meaningful exercise' of their constitutional rights." Id.

As the discussion below reveals, the Rodriguez decision represents either (or perhaps both) the tip of the spear of a more ideologically conservative Supreme Court majority, largely erected by President Richard Nixon that continues to the present day; or, it was a predictable and sensible ruling grounded in principles of textualism, recognizing both the traditional role of state and local governments in developing educational policy and the limits

of federal courts in solving certain social inequities.  In any event, Rodriguez leaves Plaintiffs here without a viable claim, but the call is closer than Defendants suggest, and closer than one might conclude on first pass.

In Brown v. Board of Education, the Supreme Court famously and unanimously held that a system of "separate but equal" education is unconstitutional.  347 U.S. 483, 493, 495 (1954).  One might reasonably ask how is it that the Court that said in Brown, "education is perhaps the most important function of state and local governments", and called education a "right which must be made available to all on equal terms", 347 U.S. at 493 (emphasis added), could hold as it did in Rodriguez.  The first answer is that it was not the same Court — not by a long shot.

The plaintiffs in Rodriguez brought their action against the San Antonio school district at a time when the legal tide was rising in favor of finding education to be a fundamental right under the U.S. Constitution — in cases brought challenging educational disparities on both substantive due process and equal protection grounds, with the equal protection challenges claiming poverty as a suspect classification.  See Adam Cohen, Supreme Inequality: The Supreme Court's Fifty-Year Battle for a More Unjust America 94-95 (2020).  For example, one of the most highly respected judges of the time, Judge Skelly Wright of the D.C. Circuit, in 1967, said that the Equal Protection Clause did not

31

permit rich and poor students to be "consigned to separate schools." Id. at 94; see also Hobson v. Hansen, 269 F. Supp. 401, 496 (D.D.C. 1967).[21]  The California Supreme Court, in Serrano v. Priest, 5 Cal. 3d 584, 589 (1971), found education to be a fundamental right under California's constitution; and a federal district court in Minnesota, in a funding suit very similar to Rodriguez, Van Dusartz v. Hatfield, 334 F. Supp. 870 (D. Minn. 1971), found for the plaintiffs, stating:

> It is not the "importance" of an asserted interest which alone renders it specially protected . . . .  Education has a unique impact on the mind, personality, and future role of the individual child.  It is basic to the functioning of a free society and thereby evokes special judicial solicitude.

Hatfield, 334 F. Supp. at 875.

Thus, it was perhaps not a surprise that the special three-judge district court in Texas hearing Rodriguez, and relying heavily on Brown, handed the Rodriguez plaintiffs a resounding, unanimous victory in December 1971.  Rodriguez v. San Antonio Independent Sch. Dist., 337 F. Supp. 280, 281 (W.D. Tx. 1971), j. rev. by San Antonio Independent Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973).  The three-judge panel found both that education was a fundamental interest and that distinctions based on wealth were suspect classifications necessitating "strict scrutiny", the

---

[21]  Judge Wright sat by designation in the District Court.

highest level of judicial review, requiring the government to prove that its discrimination served a "compelling state interest."  Id. at 282-83.

The district court's Rodriguez decision was widely seen as a harbinger of a post-Brown revolution that could reach far beyond education.  The Wall Street Journal ran a story that warned ominously that the decision could launch a "revolution" that could "reshape the face of America" to remake housing,[22] welfare, and health care.  Cohen, supra, at 98-99 (citing Frederick Andrews, School Ruling Is Seen Changing the Nature of U.S. Cities, Suburbs, Wall Street Journal (Mar. 13, 1972)).  It was in this context that the Supreme Court granted the petition to hear the appeal from the three-judge district court's decision.  But the Supreme Court that was to hear that appeal was a very different Court from the one that decided Brown, having evolved from the "Warren Court" to the "Burger Court".[23]  It was this newly-minted conservative Court that was poised to deal with the "education revolution" represented by the lower court decisions in Rodriguez and other cases.

---

[22]    Such a revolution in housing segregation and discrimination was indeed something to be feared in certain quarters, as recounted by Richard Rothstein in The Color of Law: A Forgotten History of How Our Government Segregated America (2017).

[23]    For an interesting discussion of how President Nixon managed to appoint four justices and change the direction of the Court for decades, see Bob Woodward and Scott Armstrong, The Brethren: Inside the Supreme Court.

But even as the Supreme Court in _Rodriguez_ seemingly put a stop to the education rights revolution as a matter of federal constitutional law, reform litigation accelerated in the states under state constitutions; an approach explicitly suggested by Justice Marshall in his impassioned dissent.  _See_ 411 U.S. at 133 n.100.

While some commentators like Adam Cohen see the _Rodriguez_ decision as an abdication by an ideologically transformed Supreme Court of the civil rights revolution in education sparked by _Brown_, _see_ _Supreme Inequality_ 100-10, other commentators view it more positively in historical context — as both predictable and correct from a constitutional and policy point of view.  Judge Sutton, for example, argues that _Rodriguez_ was a catalyst for state-law-based civil-rights litigation and ultimately education policy innovation:

> Like it or leave it, _Rodriguez_ unleashed school-funding innovation throughout the country that continues to this day.  And whether one welcomes the state court lawsuits that followed _Rodriguez_ or thinks them a blight on state separation of powers, the _Rodriguez_ coda puts the lie to the notion that the federal courts have a monopoly on progressive decision making.
>
> * * *
>
> One can fairly wonder whether the reforms developed by fifty state legislatures and required by twenty-eight state supreme courts over the last forty-five years would have been as far-reaching if the _Rodriguez_ Court had not

> shifted the spotlight on this issue to the
> States.

Sutton, _supra_, at 33-37.

University of Chicago Law School professor Justin Driver in
his recent book _The School-House Gate: Public Education, the
Supreme Court, and the Battle for the American Mind_, argues that
with the passage of time this result in _Rodriguez_ seems less
surprising:

> The passage of time, however, renders it less
> astonishing that Rodriguez lost his claim, and
> more astonishing that he managed to secure the
> votes of four Supreme Court justices in the
> first instance. Although the Court briefly
> contemplated serious engagement with issues of
> economic inequality during the 1960s, that
> moment now appears quite removed from the
> perspective of modern mainstream liberal
> constitutionalism. If the issue of school-
> funding discrepancies were to arrive at the
> current Supreme Court, it seems entirely
> plausible that challengers to those measures
> would find not a single justice who agreed
> that the Constitution prohibits arrangements
> resembling those contested in _Rodriguez_.

Justin Driver, _The School-House Gate: Public Education, the
Supreme Court, and the Battle for the American Mind_ 326 (2018).
Indeed, Driver recounts that even prominent "legal liberals" such
as then-state senator and University of Chicago Law School lecturer
Barack Obama and then-professor and now California Supreme Court
Justice Goodwin Liu expressed agreement with _Rodriguez_'s
fundamental holding that public school financing disputes were the
province of state and local governments and/or Congress, but not

the federal courts.  Id. at 326-27.

On the one hand, Rodriquez can be viewed through the political prism, as Cohen argues, as reflecting the dramatic shifts that presidential appointments to the Supreme Court can have on the direction of the law.  It can also be seen, however, as argued by Judge Sutton and Professor Driver, as a sensible recognition of the limits on the authority of federal courts and a catalyst of innovation and reform in the states.  And, in fact, it may be both.

The more salient questions for purposes of the pending motions, however, are: just how far reaching is the Court's holding in Rodriquez?  And does it extend to challenges like the ones presently before the Court?  It is clear beyond much question, as discussed above, that the Supreme Court in Rodriquez closed the door on most challenges to school financing systems on equal protection and/or substantive due process grounds.  But Justice Powell was careful to leave the door open, if only a crack, to a future challenge to an education program that was totally inadequate:

> Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where — as is true in the present case — no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal

36

> skills necessary for the enjoyment of the
> rights of speech and of full participation in
> the political process.

Rodriguez, 411 U.S. at 37.  This, combined with Justice Marshall's impassioned dissent, left some reason to believe the Court (or a future Court) would be open to the right kind of challenge.

And as subsequent education cases worked their way up, the Court took pains to reemphasize that its holding in Rodriguez did not close the door to every possible claim of a constitutional protection for education.  In its 1986 decision in Papasan v. Allain, 478 U.S. 265 (1986), the Court said "[a]s Rodriguez and Plyler indicate, this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review." Id. at 285.  Similarly, in Plyler v. Doe, 457 U.S. 202 (1982), the Court found that denial of public education to undocumented children did not even survive rational basis review.  Id. at 223-24.  Education advocates focused on this language as an indication that the right case could recapture the promise of Brown: the vague suggestion by Justice Powell that a minimally adequate education might, in fact, be a fundamental right, especially if that education could be tied to individuals' ability to exercise other constitutionally guaranteed rights, such as the right to speech, vote, run for office, and the like.  But the question, of course,

was just how bad did an education have to be to trigger a
constitutional violation?  Education advocates thought they found
the answer to that question, and a test case, in Detroit.

In Gary B., a panel of the Sixth Circuit took up the challenge
of the reform advocates and found there is a fundamental right to
a "basic" education in the U.S. Constitution, and specifically a
"foundational level of literacy" necessary for participation in
our country's democracy.  957 F.3d at 642, 649 (citing Wisconsin
v. Yoder, 406 U.S. 205, 221 (1972)).  The panel opinion, now
vacated, articulated a theory promoted by Plaintiffs here, that
Rodriguez did not foreclose the plaintiffs' claim:

> [W]hile Rodriguez rejected a general right to
> education on the grounds that no one is
> guaranteed the most effective or intelligent
> political participation . . . the right
> asserted by Plaintiffs in this case is far
> more fundamental.  The degree of education
> they seek through this lawsuit – namely,
> access to basic literacy – is necessary for
> essentially any political participation.

Gary B., 957 F.3d at 652.  In Gary B., "[t]he core of Plaintiffs'
complaint is that they are forced to 'sit in classrooms where not
even the pretense of education takes place, in schools that are
functionally incapable of delivering access to literacy.'"  Id. at
661.

To emphasize its underlying thesis, the Gary B. majority panel
traced the Supreme Court's education decisions and specifically
the interrelationship of public education and race discrimination

in America.   The key linkage the panel focused on is this:
education is key to the ability of citizens to effectively
participate in a democratic society; the Court said as much in
Brown and has reiterated the point over the years.   For example,
in Plyler, the Court said:

> Public education is not a "right" granted to
> individuals by the Constitution.  But neither
> is it merely some governmental "benefit"
> indistinguishable from other forms of social
> welfare legislation.  Both the importance of
> education in maintaining our basic
> institutions, and the lasting impact of its
> deprivation on the life of the child, mark
> the distinction. . . . We have recognized the
> public schools as a most vital civic
> institution for the preservation of a
> democratic system of government, and as the
> primary vehicle for transmitting the values on
> which our society rests.  [A]s . . . pointed
> out early in our history, . . . some degree of
> education is necessary to prepare citizens to
> participate effectively and intelligently in
> our open political system if we are to
> preserve freedom and independence. . . .  In
> addition, education provides the basic tools
> by which individuals might lead economically
> productive lives to the benefit of us all.  In
> sum, education has a fundamental role in
> maintaining the fabric of our society.  We
> cannot ignore the significant social costs
> borne by our Nation when select groups are
> denied the means to absorb the values and
> skills upon which our social order rests.

Plyler, 457 U.S. at 221 (citations and quotation marks omitted).
And recognition of this undeniable truth in turn means that
suppression of education on the basis of race is a means of denying
the full franchise of citizenship to that group.   Plyler held that

denial to a discrete group, undocumented children, represented an "affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." Id. at 221-22.

But of course the Court's education equity cases, from Brown through Rodriguez, Plyler, and Papason (and others), only reaffirmed the fundamental holding of Brown articulated above in Plyler: the denial of educational opportunities on the basis of race or other discrete classifications is a violation of the promise of equal protection — not a finding that some specific quantum of education is itself a fundamental right guaranteed by the Due Process Clause of the Fifth and Fourteenth Amendments. That bridge, the panel wrote, is one the Court has refused to cross, but has never torn down.

The panel then set forth the argument for finding literacy education to be a fundamental right, an argument with contours broadly sketched in a law review article from 2013 by Barry Friedman and Sara Solow, The Federal Right to an Adequate Education, 81 Geo. Wash. L. Rev. 92 (2013). The argument is grounded in the history demonstrating the importance of education in the country's evolution; the connection between literacy and enfranchisement (or disenfranchisement) based on race; and the relationship of literacy and participation in democratic society

40

to the concept of "ordered liberty".  See Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citing Palko v. Connecticut, 302 U.S. 319, 325-26 (1937), overruled by Benton v. Maryland, 395 U.S. 784 (1969)).

The Gary B. panel was careful not to sweep too broadly, noting that it is not just the economic and social disadvantage resulting from poor literacy that transforms the denial of education into a due process violation.  See 957 F.3d at 652 ("[T]he Constitution does not provide judicial remedies for every social and economic ill." (quoting Maher v. Roe, 432 U.S. 464, 479 (1977)).  Rather, the panel said, the U.S. Constitution protects a basic level of minimum education that plausibly provides access to literacy, enabling one to participate in democratic society.

> Effectively every interaction between a citizen and her government depends on literacy.  Voting, taxes, the legal system, jury duty — all of these are predicated on the ability to read and comprehend written thoughts.  Without literacy, how can someone understand and complete a voter registration form?  Comply with a summons sent to them through the mail?  Or afford a defendant due process when sitting as a juror in his case, especially if documents are used as evidence against him?
>
> Even things like road signs and other posted rules, backed by the force of law, are inaccessible without a basic level of literacy.  In this sense, access to literacy "is required in the performance of our most basic public responsibilities," Brown, 347 U.S. at 493, as our government has placed it "at the center of so many facets of the legal

> and social order," _Obergefell_, 135 S. Ct. at
> 2601; _see also_ Steven G. Calabresi & Michael
> W. Perl, _Originalism and Brown v. Board of
> Education_, 2014 Mich. St. L. Rev. 429, 552
> ("At a minimum, children must be taught to
> read so they can read the laws for themselves
> — a task that many of the Framers would have
> thought was fundamental.").

_Id._ at 652–53.

Moreover, the panel noted, our concept of ordered liberty also rests on an aspiration for equality, and it has long been recognized that quality education is the path to achieve it:

> Beyond the fact that a basic minimum education
> is essential to participation in our political
> system, there is another reason why access to
> literacy is implicit in the ordered liberty of
> our nation. "[T]hat education is a means of
> achieving equality in our society" is a belief
> "that has persisted in this country since the
> days of Thomas Jefferson." _Hunnicutt v.
> Burge_, 356 F. Supp. 1227, 1237 (M.D. Ga. 1973)
> (citing Godfrey Hodgson, _Do Schools Make a
> Difference?_, Atlantic, Mar. 1973, at 35). In
> this sense, education has historically been
> viewed as a "great equalizer": regardless of
> the circumstances of a child's birth, a
> minimum education provides some chance of
> success according to that child's innate
> abilities. _See, e.g._, David Rhode et al., _The
> Decline of the "Great Equalizer_," Atlantic,
> Dec. 19, 2012 (quoting Horace Mann, politician
> and education reformer, in 1848, and Arne
> Duncan, Secretary of Education, in 2011);
> Roslin Growe & Paula S. Montgomery,
> _Educational Equity in America: Is Education
> the Great Equalizer?_, Prof. Educator, Spring
> 2003, at 23 (discussing Mann and the history
> of the "great equalizer" concept).

_Id._ at 654.

The Gary B. opinion is probably the most compelling, modern judicial exposition of the argument that a certain "quantum" of education may in fact be a fundamental right protected by due process guarantees. But it is not the first. Justice Marshall in his impassioned dissent in Rodriguez elegantly articulated the indisputable relationship between education and the exercise of political rights and responsibilities (it deserves to be quoted at length):

> Education directly affects the ability of a child to exercise his First Amendment rights, both as a source and as a receiver of information and ideas, whatever interests he may pursue in life. This Court's decision in Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957), speaks of the right of students "to inquire, to study and to evaluate, to gain new maturity and understanding . . ." Thus, we have not casually described the classroom as the "'marketplace of ideas.'" Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967). The opportunity for formal education may not necessarily be the essential determinant of an individual's ability to enjoy throughout his life the rights of free speech and association guaranteed to him by the First Amendment. But such an opportunity may enhance the individual's enjoyment of those rights, not only during but also following school attendance. Thus, in the final analysis, "the pivotal position of education to success in American society and its essential role in opening up to the individual the central experiences of our culture lend it an importance that is undeniable."
>
> Of particular importance is the relationship between education and the political process. "Americans regard the public schools as a most vital civic institution for the preservation

43

> of a democratic system of government." <u>School District of Abington Township v. Schempp</u>, 374 U.S. 203, 230 (1963) (Brennan, J., concurring). Education serves the essential function of instilling in our young an understanding of and appreciation for the principles and operation of our governmental processes. Education may instill the interest and provide the tools necessary for political discourse and debate. Indeed, it has frequently been suggested that education is the dominant factor affecting political consciousness and participation. A system of "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." <u>Williams v. Rhodes</u>, 393 U.S. 23, 32 (1968).

<u>Rodriguez</u>, 411 U.S. at 112-13 (Marshall, J., dissenting). While Justice Marshall was writing about the fundamental role of education in the equal protection context, his plea is just as compelling with respect to the due process analysis. Thus, the <u>Gary B.</u> panel stood on the broad shoulders of Justice Marshall in reaching its conclusion.

It is difficult to disagree with the premise that education, and particularly literacy, is critical to participation in democratic society, the exercise of First Amendment rights, as well as to the voting franchise enshrined in Article I, Section 2 and the Seventeenth Amendment of the Constitution. The <u>Gary B.</u> judges found it so compelling as to invoke the protections of the due process guarantee. And Plaintiffs here hope to take that argument the next mile by requiring a minimum civics education in the public schools.

But there is a difference.  The examples cited by the court in Gary B. to illustrate why literacy is imperative for citizen participation in a functioning democracy — voting, taxes, jury duty, even reading road signs — are all indeed "inaccessible without a basic level of literacy" — but they are not wholly inaccessible without civics education.  See 957 F.3d at 652-53; see also id. at 649 (recognizing "every meaningful interaction between a citizen and the state is predicated on a minimum level of literacy, meaning that access to literacy is necessary to access our political process").  So, while it is clearly desirable — and even essential, as I argue in the Introduction — for citizens to have a deeper grasp of our civic responsibilities and governing mechanisms and American history, this is not something the U.S. Constitution contemplates or mandates.

The Rodriguez Court specifically addressed this point:

> The Court has long afforded zealous protection against unjustifiable government interference with the individual's rights to speak and to vote.  Yet we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most effective speech or the most informed electoral choice. That these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted.  These are indeed goals to be pursued by a people whose thoughts and beliefs are freed from governmental interference.  But they are not values to be implemented by judicial instruction into otherwise legitimate state activities.

411 U.S. at 35-36.[24]

There is much to admire in the Gary B. panel opinion. It makes a compelling argument grounded in history, precedent, constitutional interpretation, and public policy. It has the spirit of Justice Marshall's Rodriguez dissent in its sail. And while its fate, most likely, if it had been heard en banc or eventually by the Supreme Court, was to be overturned for the reasons explained above and in the equally well-reasoned dissenting opinion, it stands as a significant articulation of the importance of education to our democracy. And given where we are today in our society, as discussed in the Introduction above, it is a view worthy of serious consideration. But whatever the merits of the Gary B. panel opinion, the question before this Court is, assuming it was correct, can the holding be stretched to include a right to civics education? The answer to that question is, regrettably, no.

iii.  Substantive Due Process

With this unavoidable conclusion, Plaintiffs' case crumbles. Substantive due process "specially protects those fundamental

---

[24]    Similarly, the Rhode Island Supreme Court has rejected two challenges to the State's method of financing public education, finding that it does not violate the Education Clause of the Rhode Island Constitution, nor the Equal Protection and Due Process Clauses of the U.S. Constitution. See City of Pawtucket v. Sundlun, 662 A.2d 40, 42-43 (R.I. 1995); see also Woonsocket v. Chafee, 89 A.3d 778, 790-93 (R.I. 2014).

rights and liberties which are, objectively, deeply rooted in [our] Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed[.]" Glucksberg, 521 U.S. at 720-21 (internal citations and quotation marks omitted). Precedent clearly dictates that, while education as a civic ideal is no doubt deeply rooted in our country's history, there is no right to civics education in the Constitution.[25] Id. at 721 (directing that fundamental rights should be "careful[ly] descri[bed]"). To the extent that education generally has been recognized as a "right", whether constitutional or statutory (as opposed to a civic value), it has been located in state laws or constitutions. See Miliken v. Bradley, 418 U.S. 717, 741-42 (1974).

Neither is education for capable citizenship "implicit in the

---

[25] For this same reason, Plaintiffs' Privileges and Immunities claim comes up short. See McBurney v. Young, 569 U.S. 221, 226 (2013) ("[W]e have long held that the Privileges and Immunities Clause protects only those privileges and immunities that are fundamental.") (internal citation and quotation marks omitted). Likewise, their claim under the Republican Guarantee Clause of Article Four also lacks merit, see Largess v. Supreme Judicial Court for State of Mass., 373 F.3d 219, 227 (1st Cir. 2004) ("If there is any role for federal courts under the Clause, it is restricted to real threats to a republican form of government."); its cryptic nature is not an invitation to invoke it arbitrarily. Id. at 226 ("John Adams himself, twenty years after ratification of the Constitution, confessed that he never understood what the Guarantee Clause meant and that he believ[ed] no man ever did or ever will.") (internal citation and quotation marks omitted) (alteration in original).

concept of ordered liberty",[26] Glucksberg, 521 U.S. at 720-21, though this conclusion does have some appeal.  The Gary B. panel's determination that there is a fundamental right to literacy education was based on its view that literacy is essential to participation in our political system, and has historically been viewed as a "great equalizer" among rich and poor and between races.  957 F.3d at 654.  It is, as a result, "implicit in the concept of ordered liberty".  Id.  Like the Supreme Court's finding regarding marriage in Obergefell v. Hodges, 576 U.S. 644, 681 (2015), also a right not mentioned in the Constitution, the panel in Gary B. viewed literacy as critical to the maintenance of a vibrant and value-centered civic society.

If "ordered liberty" means anything, it would seem at least as likely to include informed civic participation (such as voting, political speech and association, running for office, jury service and so forth), as marriage.  See Gary B., 957 F.3d at 653.  But, in the end, while the Gary B. opinion admirably articulated the theory, this now vacated opinion is too thin a reed to support the even more tenuous argument in favor of finding civics education a liberty both fundamental and traditionally protected.  Defendants'

---

[26]    Like the judges in the vacated Gary B. panel opinion and dissent, see 957 F.3d at 656-59, 662-68, the parties in this case spend some time debating the issue of whether substantive due process can ever recognize an affirmative right, and whether the right Plaintiffs ask for here is positive or negative in nature. This Court need not enter this fray.

conduct thus solicits only rational basis review which, as explained below, it survives.

### iv.  Equal Protection

Left now is Plaintiffs' equal protection claim. "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks and citation omitted).

To demonstrate disparate treatment — "the threshold element", id. (internal quotation marks and citation omitted), of this claim — Plaintiffs allege only that low-income students are treated disparately; specifically, Plaintiffs say North Kingstown (a relatively affluent Rhode Island school district) students are being prepared for civic participation through the district's course offerings and other attendant opportunities. See Compl. ¶¶ 112-15. And, they say, discovery may reveal other affluent districts with sufficient civic-geared studies, while they are not receiving the same. See Pls.' Opp'n 34. Defendants respond that Plaintiffs doubly failed to properly plead disparate treatment and to identify an appropriate class. See Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011) (recognizing that, in alleging

an equal protection claim, a plaintiff must "identify . . . putative comparators"); see also Gov't Defs.' Mot. 20. The Court is satisfied that Plaintiffs have alleged facts highlighting relevant comparator schools. See Compl. ¶¶ 112-15 (in the context of civics education, comparing Plaintiffs' "substantially deficient" schools with "a small number of schools in the state that currently are providing their students an education sufficient to prepare them for capable citizenship in accordance with the requirements of the Constitution of the United States").

But the claim fails anyway. First, the Supreme Court has recognized the "synergy" between the Due Process Clause and the Equal Protection Clause: "[e]ach concept — liberty and equal protection — leads to a stronger understanding of the other." Obergefell, 576 U.S. at 673. True here too, and, in this case, they fail together. See Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005), abrogated on other grounds (noting that where the plaintiff "alleged an infringement of a fundamental right, both claims were subject to 'strict scrutiny' analysis" but "[o]therwise, both claims were governed by the 'rational basis' standard of review"). Absent interference with a "fundamental right" or discrimination against a "suspect class", see Plyler v. Doe, 457 U.S. 202, 216-17 (1982), Defendants' conduct need only survive rational basis review, which it easily does. See id. at 216. ("In applying the Equal Protection Clause to most forms of

state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.").

Seeking to avoid this end, Plaintiffs again argue that some "quantum of education" necessary to prepare students to "effectively exercise their constitutional rights" is a "fundamental interest" and cite to Plyler v. Doe[27] where the Supreme Court applied intermediate scrutiny.[28]  But, as discussed above, Plyler's holding was based on the total deprivation of education to a discreet subset of children (undocumented children); not the deprivation of a subset of education to all, or most, children. 457 U.S. at 221-22.  Plyler may have presented the situation the Rodriguez Court anticipated — the complete denial of education that rose to the level of an equal protection violation — but the allegations Plaintiffs bring here do not.  What's more, cases

---

[27]     Plaintiffs also cite Brown v. Board of Education, 347 U.S. at 493, for the role of education as "the very foundation of good citizenship."  Pls.' Opp'n 2-3.  While Brown described education as "perhaps the most important function of state and local governments", at its heart, Brown was about racial segregation and discrimination in public education.  It was not about the total denial of education or a subset of education, but rather the axiom that "where the state has undertaken to provide [education]", it must be "made available to all on equal terms." Brown, 347 U.S. at 493.

[28]     The Court did not use the word "intermediate" but stated that "the State must demonstrate that the classification is reasonably adapted to the purposes for which the state desires to use it." Plyler, 457 U.S. at 226 (internal citation and emphasis omitted).

following <u>Plyler</u> have declined to extend its holding beyond its "unique circumstances."  <u>See, e.g.</u>, <u>Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs</u>, 962 F.2d 136, 142 (2d Cir. 1992) (quoting <u>Kadrmas v. Dickinson Pub. Sch.</u>, 487 U.S. 450, 459 (1988)). Civics education, in the end, is not a "fundamental interest", so Defendants' conduct does not deserve heightened scrutiny.

Second, Plaintiffs have failed to adequately define a "suspect class" that would beg strict scrutiny (or anything approaching it). Plaintiffs pleaded at least four discrete groups of students, including (a) African-American, Latino, and students from low-income families, Compl. ¶¶ 76, 92-93; (b) English language learners ("ELLs"), <u>id.</u> ¶¶ 110-11; (c) students with special needs, <u>id.</u> ¶ 67; and (d) students in private schools, <u>id.</u> ¶ 74. Missing, however, is any allegation of unequal treatment as to these groups, a fatal shortcoming Plaintiffs admit. <u>See</u> Pls.' Opp'n 35 n.20. The closest Plaintiffs get to a suspect classification is sketching one that evokes wealth and poverty. <u>Cf.</u> Pls.' Obj. 13 (addressing joinder, and explaining that wealthier school districts' funds may enable them to meet State literacy and mathematics mandates and also develop a civics program, but less affluent districts lack that dual capability). But Plaintiffs seem in their papers to disclaim a wealth-based classification, saying "[a]lthough the lack of proper civic preparation in Rhode Island does have a greater detrimental impact on many poor and minority students

. . . , [P]laintiffs in this case have not defined the [P]laintiff class in terms of race, income or ELL status."  Pls.' Opp'n 35 n.20.  In any event, as discussed at length above, the Supreme Court has declined to recognize poverty as a suspect class.

Plaintiffs' argument is the same as one that the Supreme Court has rejected multiple times — that the system of funding public education through local property taxes violates the Equal Protection Clause.  See Papasan, 478 U.S. at 288 ("The rationality of the disparity in Rodriguez . . . rested on the fact that funding disparities based on differing local wealth were a necessary adjunct of allowing meaningful local control over school funding[.]"); see also Kadrmas, 487 U.S. at 458 ("We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.").

Without grounds for scrutiny with more bite, Plaintiffs are left to carry the "heavy burden" of demonstrating that the State's actions (i.e., establishing a regulatory framework for guidance of school committees, local administrators, and teachers to teach civics) have no rational relationship to a legitimate government objective, and therefore are arbitrary and irrational.  See Rodriguez, 411 U.S. at 40.  "Equal protection claims tested by this rational basis standard, famously called by Justice Holmes the 'last resort of constitutional argument[]', rarely succeed."

Massachusetts v. U.S. Dep't of Health & Human Servs., 682 F.3d 1,
9 (1st Cir. 2012) (internal citation omitted).

　　To start, if there is no constitutional right to any civics
education, then it is unlikely (if not impossible) that Rhode
Island's decision not to provide "adequate" civics education is
irrational or arbitrary.  See Kadrmas, 487 U.S. at 461-62 (finding
no constitutional violation in charging for school bus service,
where the Constitution does not require that such bus service be
provided at all); see also Spath v. Nat'l Collegiate Athletic
Assoc., 728 F.2d 25, 28 (1st Cir. 1984) (finding "no fundamental
right to education", and therefore "[no] fundamental right to play
intercollegiate hockey").  But Rhode Island also has a legitimate
interest in maintaining local control over its education system,
as the State's control allows it to ensure an education for each
child and delegate responsibility to local authorities over that
education's implementation; to that end, several provisions of the
Rhode Island General Laws show the importance legislators placed
on vesting control and management of education with local school
committees.  See, e.g., R.I. Gen. Laws § 16-2-9(a)(1)-(26); § 16-
2-6; § 16-22-2; Rodriguez, 411 U.S. at 49 ("The [state] system of
school finance is responsive . . . .  While assuring a basis
education for every child in the State, it permits and encourages
a large measure of participation in and control of each district's
schools at the local level.").  The Rodriguez Court stated that

"[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society . . . [l]ocal control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well."  411 U.S. at 49 (quoting the majority and dissenting opinions of Wright v. Council of the City of Emporia, 407 U.S. 451, 458, 478 (1972)).  As pleaded, Plaintiffs cannot show Defendants' actions are arbitrary or irrational, and therefore they readily satisfy rational basis review.

IV.   Conclusion

Plaintiffs should be commended for bringing this case.  It highlights a deep flaw in our national education priorities and policies.  The Court cannot provide the remedy Plaintiffs seek, but in denying that relief, the Court adds its voice to Plaintiffs' in calling attention to their plea.  Hopefully, others who have the power to address this need will respond appropriately.  For the reasons discussed above, this Court GRANTS both Defendants' Motions to Dismiss Plaintiffs' Complaint, ECF Nos. 23 and 25.

IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: October 13, 2020